# Board of Revenue of Jefferson County, *et al.* *v.* Huey, *et al.*

### Mandamus.

(Decided January 13, 1916.   70 South. 744.)

1. **Counties; Officers; Place for; Maintenance.**—Acts 1915, p. 549, does not have the effect to establish a new county or change an existing county boundary in violation of § 39, Constitution 1901.

2. **Same.**—General Acts 1915, p. 549, is not violative of § 41, Constitution 1901, since the word "courthouse" and "county site" are synonymous and signify the seat of government, and the seat of government is not removed when in good faith some only of the county functions are required to be performed elsewhere than at the county site; especially since the legislature, both before and after the adoption of the Constitution of 1901, established branch offices for county officers at places other than the county site.

3. **Constitutional Law; Construction; Legislative.**—While the legislative construction of a constitutional provision cannot be accepted as final and binding upon the judiciary, its construction is influential when the provision is of doubtful meaning or effect, and the legislative interpretation has not been questioned, but has been acquiesced in and acted upon for a considerable period of time.

4. **Statute; Special or Local Law.**—The Constitution does not impair or restrict the power of the legislature to classify in good faith, and not arbitrarily, subjects of legislation; hence, under § 110, Constitution 1901, General Acts 1915, p. 549, is not a local law within the inhibition of § 106 of the Constitution.

5. **Same; Title; Subject.**—Acts 1915, p. 549, relates only to a single subject, and is not violative of § 45, Constitution 1901.

6. **Same.**—The title expressed in Acts 1915, p. 549, is not only single, but satisfies the other requirements of § 45, Constitution 1901.

APPEAL from Bessemer City Court.
Heard before Hon. J. C. B. GWIN.

Petition by T. T. Huey and others for mandamus to the Board of Revenue of Jefferson county, and the individual members thereof, requiring them to provide quarters for branch offices for certain county officers in Jefferson county. From a decree granting the writ, respondents appeal. Affirmed.

W. K. TERRY, for appellant. THOMAS T. HUEY, J. A. ESTES, G. F. GOODWYN, F. R. MATHEWS, and W. S. WELCH, for appellee.

McCLELLAN, J.—This proceeding looks to the issuance of a writ of mandamus to require the board of revenue of Jefferson county and its individual members to comply with the laws of the state; by providing and furnishing office or quarters for the judge of probate of Jefferson county at Bessemer, Jefferson county, as well as necessary fixtures, books, blanks, and other supplies required by law for the same; by providing and furnishing offices for the tax collector and the tax assessor and for the board of revenue of that county, at Bessemer; by providing and furnishing branch offices for county officers at Bessemer. The petition for the writ is grounded in the legislative act approved September 16, 1915 (General Acts, Sess. 1915, pp. 549-553). The writ was granted as prayed. The respective counsel concur in presenting the matters decisive of the merits of the controversy, eliminating all other less vital subjects of disputes, viz., the constitutionality of the act above noted. The title of the act under review is as follows: "An act to provide for and require all county officers of all counties in Alabama now having or which may hereafter have, a population of as much as one hundred and fifty thousand people according to the last federal census, or any such census which may hereafter be taken, to install, equip and maintain, in addition to their offices at the county sites of such counties, offices at each other place in such counties where a circuit court or court of like jurisdiction, is now authorized by law to be held, or where such court may hereafter be authorized by law to be held, for the transaction of all business pertaining thereto, that may arise in or be connected with that part of such county within which the cases arising therein, may be tried in such circuit court or court of like jurisdiction at such place, to provide for the selection, qualification and compensation and fix the powers and duties of the deputies of

the respective officers of such counties, to act for and assist such officers in the discharge of their duties in connection therewith, to fix the duties of the respective county officers of such counties with reference thereto; to provide equipment for such offices, including stationery, records, books, dockets, furniture, filing cases and other equipment for such offices, similar to that kept in the respective offices of such counties at the county site; to prescribe the business of the respective offices and officers of such counties that shall be transacted at such places; to prescribe and regulate the instruments recorded thereat, and to otherwise provide for the installation, equipment and maintenance of such offices and officers at such places for the transaction of all business pertaining to such offices and officers that may arise within such territory of such counties."

Aside from two requirements made in the body of this act, to which we will later refer, the title of the act foreshadows the substance of the act. Its general purpose, particularly expressed in many provisions in the body of the act, is to establish branch offices, at Bessemer, for county officers performing county functions in Jefferson county, and to affirmatively restrict the performance of these functions with respect to matters arising in, or referable to, a certain defined territorial area in the southern part of Jefferson to the official headquarters thereof at Bessemer. In short, the effect of the act, if valid, is to forbid the performance of the therein defined county functions, by county official agencies, at Birmingham, the county site, and to require their performance at Bessemer, a place not the county seat of the county.

By an act approved February 28, 1901 (Weakley's Local Laws of Jefferson County, p. 115 et seq.), the city court of Bessemer was established; and its territorial jurisdiction was laid over precincts 1, 2, 3, 4, 5, 24, 27, 33, 35, 40, 41, and 7, naming, besides thus numbering, the precincts. The objections to the constitutional validity of the act of 1915 are predicated of the provisions of section 41, subdivision 11 of section 104, and sections 39, 45, and 106 of the Constitution of 1901. Section 41 provides that "no courthouse or county site shall be removed except by a majority vote of the qualified electors" of the county voting at an election held for that purpose. Subdivision 11 of section 104 provides that the Legislature shall not pass a

special or local law "changing or locating a county seat." Section 39 prescribes the conditions under which the boundaries of counties may be arranged and designated and inhibits their alteration except by a vote of two-thirds of each house of the Legislature, and also fixes the territorial limits of new counties and prohibits the reduction of existing counties below a certain area and population, with defined exceptions.

(1) It is manifest that the act of 1915 did not intend, or attempt, to effect the change of an existing county boundary or the establishment of a new county. The objection to the act rested on the provisions of section 39 of the Constitution of 1901 is without merit.

(2) Does the act offend section 41; does it attempt to effect the removal of the county seat without the sanction of the ballot?

In the comparatively recent decision delivered here on appeal of the *Bank of Lafayette v. McNaron,* 172 Ala. 469, 55 South. 242, it was ruled that an act requiring the circuit court of a county to be regularly held at a point therein other than the county site did not offend the organic law prohibiting the removal of a courthouse or county site. "Courthouse" and "county site" had been held to be synonymous, and to signify "seat of government."—*Matkin v. Marengo County,* 137 Ala. 155, 164, 165, 34 South. 171; *Bank of Lafayette v. McNaron, supra.* In the earlier appeal of the *Matkin-Marengo County* controversy (134 Ala. 275, 280, 32 South. 669, 670), Justice Sharpe, writing for the court, said of the presently pertinent provisions of section 41 of the Constitution inhibiting the removal of a courthouse or county site without the sanction of the ballot: "Judicial notice of proceedings in the late Constitution Convention discloses that this clause was inserted in the organic law (of 1901) in response to public sentiment engendered by supposed abuses by the Legislature of the power it formerly had to change a seat of justice by direct enactment; hence the imperative prohibition of such changes except by the method defined."

As was noted in the second *Matkin Appeal, supra,* and renoted in *Bank of Lafayette v. McNaron, supra,* in at least two counties in the state (Barbour and Blount), the Legislature, previous to the adoption of the Constitution of 1901, had established branch offices for county officers, at places other than at

the county sites; and also had required the convention of courts in these counties at places other than the county sites. The doctrine of *McNaron's Case, supra,* is that the provision of the Constitution (section 41) prohibiting the removal of a county site without the sanction of the ballot is not offended by an enactment requiring the performance of a county function or functions at a place, in a county, other than the county site. The object of the inhibition in section 41 is to prevent the removal of the county site; the abolition of a seat of county government, otherwise than as the result of an appropriate election. Section 41 was not intended to prescribe or to provide that county functions could only be authoritatively performed at the county seat. Such a seat of county government is not removed, is not abolished, is not denuded of its character as a governmental headquarters in a county, when, in good faith *(Bank v. McNaron, supra),* some only of the county functions are required to be performed elsewhere than at the county site. This must have been the mind of the makers of the Constitution of 1901, else the conclusion would necessarily be that the writers of the organic law of 1901 intended, and effected upon the adoption of that Constitution, the annulment of legislation authorizing and requiring the performance of certain county governmental functions at places in Barbour and Blount counties other than at their respective county sites. The Legislature of 1907 enacted laws requiring certain county functions, including the holding of the courts, to be performed at Enterprise, in Coffee county; Elba being the county site.—Local Acts 1907, pp. 233, 234, 243-246, 279-288. Counterparts of many, if not practically all, of the provisions of the act of 1915, now under review, may be found in the Coffee county acts.

(3) While a legislative construction of a constitutional provision cannot be accepted as final by the judiciary, yet it is justly influential when the provision is of doubtful meaning or effect, and this legislative interpretation of the provision has not been questioned, has been acquiesced in, and acted upon for a considerable period.—*Ex parte Hardy,* 68 Ala. 303, 318; *Moog v. Randolph,* 77 Ala. 597, 606; 8 Cyc. p. 737. The Coffee county acts have been in force for upwards of eight years. To now so pronounce as to render them abortive in their effects to constitute a branch headquarters, at Enterprise, for the performance of

certain county functions, would subject the affairs and people of that county, as well as of Barbour county, to say nothing of other counties similarly situated, to many consequences of a serious character; consequences that it is manifestly desirable to avert if that is reasonably, fairly possible. The public purpose in all such enactments must be to subserve the public convenience and welfare of the people in the counties concerned, and it is a legislative prerogative to determine such matters, subject only to the judicial power to consider and to decide whether, in the action taken by the lawmakers, some provision of the organic law has been violated. Of course, if the lawmakers should attempt an evasion of the constitutional restriction or mandate by subterfuge—a legislative purpose that cannot be anticipated, assumed, or presumed—the courts would not hesitate to pronounce the effort abortive.—*Bank v. McNaron*, 172 Ala. 469, 373, 55 South. 242. In respect of the act of 1915, there is no manifestation of a legislative purpose to remove, to abolish, the county site of Jefferson county, offensive to section 41 of the Constitution. The enactment's inspiration is, hence, to be referred to the entirely justifiable purpose to conserve the convenience and promote the public welfare of at least a large proportion of the people of Jefferson county.

(4) It is next insisted that the act of 1915, while guised as a "general" law, is, in fact, a "local" law; these laws being respectively characterized and defined in section 110 of the Constitution of 1901. If this act is a local law, the omission to advertise notice of the purpose to apply therefor renders it void. —Const. § 106. Section 110 of the Constitution thus defines "general" and "local" laws: "A general law * * * is a law which applies to the whole state; a local law is a law which applies to any political subdivision or subdivisions of the state less than the whole. * * * "

The object this act intended to accomplish was and is the establishment of a branch headquarters for county government, whereat county officers should perform certain county functions. To effect the legislative purpose it was necessary to define the places at which and the circumstances under which such branch headquarters should be established. Evidently it was not thought to be desirable to establish such headquarters in all the counties of the state, the matter of population being considered a

predominating factor in determining the public convenience to result from the establishment of such subordinate headquarters for the performance of certain county functions. Under these circumstances, intimately related to the legislative purpose in view, it was essential that a classification of the subjects of the proposed legislation should be made. In its provisions touching legislation, our Constitution has not impaired or restricted the power of the Legislature to classify, in good faith, and not arbitrarily, subjects of and for legislation; and this court has often recognized population—when considered and appropriated in good faith—as the basis and means for the creation and definition of a class or classes for legislative purposes.—*State v. Thompson*, 193 Ala. 561, 69 South. 461, 464, 465, among others.

In view of the object sought to be attained by the act under review, it is plain that the use in this act of population as the measure of and means for defining a class upon which the enactment should operate effected no violation of constitutional restraints. Passing over this established means of classification for legislative purposes, the contention is that a so-called "reclassification," in addition to that predicated of population, is made in the act by the provision establishing a branch headquarters for the exercise of county authority and functions at places whereat the circuit court or a court of like jurisdiction is now held or may be hereafter authorized by law to be held. It is asserted that *State ex rel v. Weakley*, 153 Ala. 648, 45 South. 175, concludes to the support of this contention, and requires the pronouncement that the act under review is a local, not a general law. The insistence is resolved to this: That a valid classification was not made for the operation of this act. The decision just mentioned was rested for authority on *Scowden's Appeal*, 96 Pa. 422. There, as in our *Weakley Case*, the object of the legislation was a certain class of municipalities; the class of municipalities being defined by the measure and means of the population thereof. In neither case were counties the primary consideration of the legislation. But in both cases there was provided in the acts assailed the further restriction—a distinct element of the classification essayed—based upon the population of the county in which the municipality of the population specified was located. Both acts were held void and upon the ground

that their effects were to designate, not to classify, the subjects of their operation. As read from the judicial result in these cases, the real fault in each was that one of the two elements (one of the factors) constituting the class, of municipalities (not counties), undertaken to be defined, was found to be in the unrelated, unassociated measure of population of the county in which the municipality was situated.

There is no reason forbidding a single classification, for legislative purposes, made by the coalescing effects of two elements or factors, reasonably related and associated and capable of marking a single distinction, or of defining a discrimination, between types of a more general aggregation of persons or things. There is nothing objectionable in a segregation—for the legislative purpose of enacting a general law—of those subjects of legislation which have a common characteristic or common characteristics when measured or defined by related elements that combine to mark a distinction, or to discriminate them. If, as was the case in *Scowden's Appeal* and in our *Weakley Case,* an element going to mark the distinction or discrimination sought to be established is without reasonable relation to the thing to be affected and the purpose to be accomplished by the legislation, guised as a general law, the legislative effort must fail because the means of attempted classification are inapt and inappropriate, and hence is arbitrary. While the ruling made in our *Weakley Case* is undoubtedly sound, yet a good deal might be said in criticism of the soundness of the opinion in the *Scowden Appeal* if the court sites there involved were with reference to tribunals having jurisdiction coextensive with the counties falling within the definition of the act; for it is readily conceivable that the legislative judgment might quite reasonably conclude that the public welfare and the convenience of the people of a populous county would be better conserved by increasing the number of trial court sites, and terms of court thereat, when a less populous county would suggest or justify no such action, since it is common knowledge that the maximum volume of "grist for the mills" the courts provide is largely, if not entirely, measured by the number of people within the area to be served by the tribunal.

The act under review is affected with no such infirmity as leads to the invalidity of the act considered in the *Weakley Case,* 153 Ala. 648, 45 South. 175. That was a purely municipal act,

[Board of Revenue of Jefferson County, et al. v. Huey, et al.]

and one of the elements sought to be employed to constitute a class was foreign to the purpose and subject of the act. The act here in question employs two related elements to define and constitute the class to which alone the act has application, viz.: (a) Minimum population, and (b) present or future provisions of law under which, in a county possessing a population above the minimum prescribed, a circuit court or a court of like jurisdiction is required to be held. The coalescing effect of these elements define the class of counties to which the law is applicable, or may, in the future, be applicable, with the result that subordinate headquarters, for county officers performing county functions, are or may be later established by the act. That subsequent local legislation may be necessary to permit the application or operation of this law to any county that may attain the measure of population specified in the act by providing for the holding of the court described at a place or places other than the county site, does not prevent the act under review from being a general law.—*State ex rel v. Thompson*, 142 Ala. 98, 110, 111, 38 South. 679. When the object sought to be accomplished by this act is borne in mind, it is quite clear that both discriminatory elements, whereby is wrought the classification defined, relate to county functions, and are based upon characteristics which distinguish counties of the type described by the act from counties which do not conform, or are not made by subsequnt legislation to conform, to the conditions, constituting a small class, provided in the act. The lawmakers may reasonably conclude that the more populous a county is, the more the public convenience can be conserved by a branch headquarters for the performance of county functions; and the same authority might reasonably conclude that a condition present, or to be, or that may be, subsequently provided by means of laws, requiring terms of courts, having jurisdiction beyond a merely municipal jurisdiction, to be held in a county of the minimum population prescribed, should be a subcenter of county authority and a subordinate site for the performance by county officers of certain county functions. The act in question is a general law, based upon a single valid classification; and is, hence, not offensive to section 41, or to subdivision 11 of section 104, of the Constitution of 1901.

(5, 6) The remaining objection to the validity of the act is that its title, before quoted, is deficient or defective as meas-

ured by the requirements of section 45 of the Constitution. Tha
section restricts an act to one subject, and provides that the sub
ject shall be clearly expressed in the title to the act. The sub
ject of the act is single, viz., the establishment of a branch head
quarters for the discharge of county functions by county officers
It meets the exaction of the other stated feature of section 45
The only possible theory upon which a contention could be reste
that the body of the act contains provisions not comprehende
or foreshadowed in the title are the two features of the act where
by terms of courts of probate and of boards of revenue or court
of county commissioners are required to be held at the brancl
sites prescribed by the act. This possible view has been carefull
considered. Our conclusion is that it is untenable. To sustai
it would be to apply the hypercritical to the manifest exclusio
of the reasonable and the practical. It is clear from the titl
that the legislative purpose in the enactment would be and wa
to effect and to govern the performance of certain functions b
all county officers in counties falling within the definition of th
act. County officers, and they alone, afford the personnel fo
the courts just before mentioned. Upon such officer, chosen b
the electorate of the county, are imposed by law the dis
charge of the duties requisite to the exercise of the jur
isdictions and powers conferred on the courts named. Th
title of the act refers in the broadest terms to all county officer
and gives unmistakable notice of the purpose to treat of the du
ties of these officers within certain limitations. With this quit
ample title it is not reasonably possible that any one could hav
been misled or deceived. One reading the title could not escap
the conclusion that the act's body was intended to affect, and
would affect, the duties of all county officers, in such countie
of the defined class; and among the duties commonly known t
be laid on the judge of probate and the members of the board
of revenue or commissioners' courts are those having reference
to the terms of their convention and the performance of the func
tions provided by law to be discharged by such courts.

The act is not subject to the objections presented. It is valid.
The order of the judge of the city court of Bessemer awarding
the writ of mandamus was well issued. It is affirmed.

Affirmed.

ANDERSON, C. J., and SAYRE and GARDNER, JJ., concur.