167 So. 340

**DIXON v. STATE.**

6 Div. 945.

Court of Appeals of Alabama.

Jan. 14, 1936.

Rehearing Denied Feb. 4, 1936.

Dan Trawick, Jr., of Birmingham, for appellant.

A. A. Carmichael, Atty. Gen., for the State.

Brief did not reach the Reporter.

SAMFORD, Judge.

The sole and only question of merit in this case is as to the constitutionality of an act of the Legislature, approved September 13, 1935, and entitled, "An Act To provide for and regulate the mode of selecting and impaneling juries in all criminal and quasi criminal cases in circuit courts in counties having a population of 300,000 or more according to the last or any future

Federal census," Acts 1935, p. 1010. Since the Constitution of 1901, the courts of this state, through the various pronouncements of the Supreme Court, are thoroughly committed to the proposition that a law which seeks to classify the state into various subdivisions on account of and by reason of the population in the classification, provided such classification is made in good faith and not a mere effort to avoid the restrictions of the Constitution, is a general law and not local, although its application might, for the time being, apply only to a subdivision of the state, leaving the remainder of the state in a classified group to be governed by the general law theretofore existing.

Where there is a substantial difference in the population and the classification is made in good faith, reasonably related to the purpose to be effected and to the difference in population which forms the basis thereof, and not merely arbitrary, the enactment is a general law, although at the time it may be applicable only to one political subdivision of the state; but if the classification bears no reasonable relation to the difference in population upon which it rests in view of the purpose to be effected by such legislation, and clearly shows it was merely fixed arbitrarily, guised as a general law and in effect is a local law, such enactment would then be a plain violation of the Constitution. Reynolds v. Collier, 204 Ala. 38, 85 So. 465; Vaughan v. State, 212 Ala. 258, 102 So. 222; Walden v. City of Montgomery, 214 Ala. 409, 108 So. 231; State v. Gullatt, 210 Ala. 452, 98 So. 373.

In making such classification, the population as shown by the federal census is held to be a fair basis for the purpose of special legislation applicable to the entire state. Cobbs v. Home Ins. Co., 18 Ala. App. 206, 91 So. 627.

The opinion of the trial judge, the Hon. J. Russell McElroy, rendered by him, on motion for a new trial, is so apt and well stated, with regard to all of the questions raised in this record, that we adopt the same as our own opinion as being the law of the case.

"The defendant presents upon her motion for a new trial certain points raised by her upon the trial having to do with the selection and impaneling of the jury before which she was tried.

"Her complaint is that she was put to trial over her objection, the objection being made before a jury obtained from a panel of the regular jurors summoned for the week in which she was tried, and that no special venire was drawn and summoned pursuant to section 8644 of the 1923 Code of Alabama. She further complains that she was allowed to strike only from a list of thirty competent jurors instead of from the entire list of jurors that had been organized for service for the week. She further complains that she was not allowed two strikes from the list furnished to the state's one, but on the contrary was allowed only an equal number of strikes with the state.

"This court acted pursuant to an act of the Legislature entitled, 'An Act To provide for and regulate the mode of selecting and impaneling juries in all criminal and quasi criminal cases in circuit courts in counties having a population of 300,000 or more according to the last or any future Federal census.' The body of said act reads as follows:

"'Section 1. The provisions of this Act shall apply to and be operative only in circuit courts of this State in counties having a population of 300,000 or more according to the last or any future Federal census.

"'Section 2. In every criminal case, any defendant or the prosecution may demand a struck jury. When so demanded, the clerk or his deputy or assistant or other person designated by the judge presiding, shall furnish all parties with a list of twenty four competent jurors in attendance upon the court, from which a jury must be obtained by the prosecution striking first from the list the name of one juror, and then the defendant striking from the list the name of one 'juror, and thereafter continuing to strike off one name alternately until only twelve jurors remain on the list, and these twelve thus selected shall be the jury charged with the trial of the case, except that in capital cases the list of competent jurors shall contain thirty names.

"'Section 3. The said twenty four jurors shall be obtained from all of the jurors then in attendance upon such courts and who at the time are readily and presently available for the trial of the case in such manner but without selection of names as the judge of such courts may prescribe by rule of court, or if no such rule is provided, then in such manner, but without selection of names, as ordered by the judge presiding on the trial of the case. In the event neither the prosecution nor any de-

fendant demands a struck jury; the court shall obtain without selection of names, twelve competent jurors from the jurors then in attendance upon the court, and readily available for the trial, which said twelve jurors shall try the case.

" 'Section 4. In the event that twenty four competent jurors are not readily and presently available for the striking of a jury in a misdemeanor or quasi-criminal case, then the prosecution and the defendant or defendants may be required to strike from the competent jurors that are presently and readily available for the trial provided the number of competent jurors is not less than eighteen. The striking of names when less than twenty four competent jurors are presently and readily available for the trial shall proceed in the same order and manner as if striking from a list of twenty four jurors, until only twelve jurors remain on the list and these twelve shall be jury charged with the trial of the case.

" 'Section 5. In case two or more persons are tried jointly, the solicitor shall strike one and each defendant shall have the right to strike off one name and they shall continue thus to strike off names until only twelve remain, and the twelve thus selected shall be the jury charged with the trial of the defendants.

" 'Section 6. If any defendant or defendants should refuse to strike the number of jurors allowed him by this act, from the list furnished him, then the judge presiding shall proceed to strike off the names for the defendant or defendants refusing to strike.

" 'Section 7. No special venire shall be ordered or drawn for the trial or trials of a defendant or defendants in capital felonies, and a defendant or defendants in capital felony cases shall only be entitled to strike from a list of twenty four competent jurors obtained from the regular juries in such courts.

" 'Section 8. It shall not be a ground to quash the venire or to continue any case of the kinds referred to in this act that the sheriff has failed to summon any of the jurors drawn for service during the week in which said case is set for trial, or that any of the jurors summoned have failed or refused to attend court, or that there is any mistake in the name of any juror summoned, or that a judge, either in open court or otherwise has, for any cause, excused any juror summoned for service for the week in which said case is set for trial.

" 'Section 9. The provisions of this act are directory merely and not mandatory.

" 'Section 10. If any section or provisions of this act shall be declared unconstitutional and void, this shall not affect any other provision or section not in and of itself unconstitutional and void.

" 'Approved September 13, 1935.'

"The defendant has challenged the validity of this act claiming that it is violative on several sections of the 1901 Constitution of Alabama. The court will proceed to consider the several objections which have been made by the defendant to the constitutionality of the act above referred to.

"Section 106 of the Constitution.

"The defendant contends that said act is a local act and is void for noncompliance with the provisions of section 106 of the Constitution which prohibits the passage of a local law unless notice of the intention to apply for the passage thereof shall have been published for a specified time beforehand. The pivotal point for decision upon this contention is whether the said act is a local law. This court is of the opinion that it is not a local law for the reasons below indicated. It is the law of Alabama, as elsewhere, generally, that classification in statutes predicated upon differences in population is permissible as general legislation where the class upon which the law is to operate is characterized by some substantial qualities or attributes which in reason render such legislation necessary or appropriate for the class. Of classification predicated upon differences in population, our Supreme Court has held that where there is a substantial difference in population and the classification is made in good faith, and is reasonably related to the purpose to be effected and to the difference in population which forms the basis thereof, and where all parts of the state by an increase in population will come within its operation, it is a general law, even though at the time of its passage it may be applicable to only one political subdivision of the state. State v. Thompson, 193 Ala. 561, 69 So. 461; Board of Revenue of Jefferson County v. Huey, 195 Ala. 83, 70 So. 744; Griffin v. Drennen, 145 Ala. 128, 40 So. 1016; State ex rel. Gunter v. Thompson, 193 Ala. 561, 69 So. 461;

State ex rel. Crenshaw v. Joseph, 175 Ala. 579, 57 So. 942, Ann.Cas.1914D, 248; Walden v. City of Montgomery, 214 Ala. 409, 108 So. 231; State ex rel. Mims v. Bugg, 196 Ala. 460, 71 So. 699; Cobbs v. Home Ins. Co., 18 Ala.App. 206, 91 So. 627:

"Counties having a population of 300,000 or more are populous centers so far as population in Alabama goes. The substantial qualities or attributes of such counties, which justify the differences in the rules for the selection and impaneling of juries in such counties, are solid and substantial. It is a fact known of all men who have reached their maturity and who have enjoyed the general experience common to mankind that populous centers are the central nurseries and hotbeds of crime. Alabama's only county containing the prescribed population of 300,000 or more proves the last assertion. Jefferson county is famed the world over for its extravagantly high rate of unlawful homicides, robberies, burglaries, and other serious offenses against the law. The Legislature may well have considered, and been amply justified in concluding, that the protection of the people of this state in its heavy populous counties required a strengthening of the procedure for combating the lawless elements in such counties. It is a well-known fact that populous communities are the thriving ground of gangsters and racketeers. The experience of this country as a whole is that it is in the populous centers that the most revolting outrages against society, such as most of the massacres and kidnappings that have shocked the nation, are committed. The ratio of juvenile delinquency in populous centers far exceeds the ratio prevalent in rural or less populous areas. The opinions of nationally recognized students of social conditions in the United States all concur in the expression that the frequency of crime commission in the heavily populated communities is many times greater per 100,000 capita than in the sparsely populated communities. Let us hear what some of the great experts say about the problem:

"In the publication 'Recent Social Trends in the United States,' published in 1933, which embodies the report of the President's Research Committee on Social Trends, a work that is without a superior, there appears at pages 1134 and 1135 the following comment:

" 'It is apparent that the larger the city, the higher the rate (of crime commis-sion). The smallest cities have a rate less than that of the largest, or even of the average for the cases given.'

"Note 33: 'Since the movement of population is in the direction of the areas of higher density, an increasing percentage of the American people seems destined to live in an area of high crime rates. The increase of population in the large cities will mean more crime absolutely, and probably relatively as well.'

"In a noteworthy publication entitled; 'Criminology and Penology,' published in 1935, Dr. John Lewis Gillin, one of the nation's most outstanding sociologists, says:

" 'The explanation of the greater criminality of the large city is to be found in the difference in social conditions in the city and country. The elements of the explanation may be summarized as follows:

" '1. There is more law-breaking in the city than in the country because there are more laws to break. Moreover, there are more officials charged with the responsibility of seeing that breakers of the law are dealt with by the courts. The same man, therefore, might have an entirely different history in the city and in the country. In the country he might commit the same act as in the city and yet escape observation. Furthermore, the complex relationships of city life demand that those relationships should be more carefully guarded and regulated than in the country.

" '2. The contacts in the crowded city are much more frequent and therefore provide irritating situations which lead to personal violence.

" '3. The pressure of poverty is frequently very much harsher in the city than in the country, and therefore the economic motives to crime probably play a larger part in city populations than in sparsely settled districts.

" '4. The crowded living conditions in cities, denying common decency in houses, and the incitements to vice, more frequent and also commercialized, intensify the demoralizing effects of contact between people.

" '5. The crowded city, with the possibility of hiding draws the more turbulent and criminally inclined elements of the country to itself. Consequently, more criminals of the habitual or professional

kind will congregate in the city. Furthermore, it is in the city where those who have been thoroughly demoralized find the excitements and the vice which they crave.

" '6. Because of the economic opportunities offered by the city, its population is composed of a higher percentage of adults than the country population. Since we have seen that the young adult is in the age of highest criminal incidence, it is natural to expect that the rate of criminality in cities would be greater than in the country.'

"In another treatise of surpassing value entitled "Crime and the Criminal Law in the United States" (1930) by Dr. Harry Best, an eminent sociologist, and author of many other books upon social conditions, the reasons for urban tendencies to crime are expressed as follows:

" 'There are several reasons why there may be expected a greater amount of crime in cities than in rural areas—both as to conditions which produce criminals and as to conditions which help criminals to commit crime or to escape. To meet the increasing intensity and complexity of urban life, various regulations have to be adopted, and these are bound to suffer violation to a greater or less extent. Over much wrongdoing in the city hangs the veil of secrecy. In its vast throngs identity may soon be lost. Outsiders even come to the city for the purpose of indulging in forbidden activities, feeling secure from prying eyes. The exhausting nervous strain of modern life and the failure to adjust's one's self to the requirements of the present day order are likely to tell or to show their effects the more readily and the more pronouncedly in the city—perhaps largely induced by its very conditions. Imitation and the power of suggestion, so far as they are factors in the causation of crime, may be expected to be much stronger in the city, with its multiplied newspapers, theaters, crowd movements, and the like. The city may have more restricted or more baneful facilities for play and recreation— a circumstance always having close connection with the commission of crime by youth (though this is to some extent offset by the possession by cities of better organized recreation).

" 'Accumulations of wealth and concentration of poverty are alike the more marked in the city; and whatever their effects upon crime, they show themselves more openly in the city. Contrasts of rich and poor are set off against each other in glaring fashion. In the city the economic struggle in general becomes the keener. Opportunities for the commission of certain crimes, no less than direct temptations thereto, with perhaps much in the way of plunder to reward effort, rather abound in the city, especially such crimes as burglary, swindling, and other crimes against property for gain. No less can be said for such crimes as prostitution, disorderly conduct, etc. This is especially true with respect to persons of weak wills or weak minds, or with respect to persons who have become hardened to crime. For some classes of criminals the city constitutes a rich field of operations. Vice and immorality, with actual crime in attendance or close behind, may be directly and deliberately organized in the city, to ensnare the feet of those who otherwise would not be tempted. Entrepreneurs are ever on hand, and customers are not far to seek. The city harbors solicitors of wrongdoing. The gangster and his compeers are developed and grow to power in the city. To it criminals gravitate. In its density of life they are afforded a hiding place. In it illgotten gains can the more easily be disposed of. In it pursuit may be eluded, and new crimes concocted. A sort of criminal fraternity is created. The lure of the criminal career may in the city become an actuality.'

"The known increase in the relative frequency of crime commission in populous counties of 300,000 or more justified the strengthening of the arm of the law-enforcing agencies by the enaction of the rules changing the methods of selecting and impaneling juries in criminal cases in such counties. It was and is a solid condition of facts with which the Legislature was dealing and not some mere fantastic theory. To meet the relatively increased state of lawlessness in such counties the Legislature was well justified in putting the selection and impanelment of juries in criminal cases in such counties in a class to itself, by abolishing special venires, limiting the number to be placed on the list to be stricken from, and equalizing the number of strikes between the state and the defendant.

"It is worthy of note that the Supreme Court has as yet held no statute limited in its operation to cities or counties of having a population of 100,000 or 300,000 to be a local law on the ground that there was no

difference in conditions justifying the classification.

"In every case which the writer has been able to find upon the subject it has been held that classification by population is proper, as general legislation, for regulating the manner of selecting juries. People v. Dunn, 157 N.Y. 528, 52 N.E. 572, 43 L.R.A. 247; People v. Onahan, 170 Ill. 449, 48 N.E. 1003; State v. Berkeley, 64 S.C. 194, 41 S.E. 961; Henwood v. People, 57 Colo. 544, 143 P. 373, Ann.Cas. 1916A, 1111; Martin v. Superior Court, 194 Cal. 93, 227 P. 762; Dunne v. Kansas City Cable Ry. Co., 131 Mo. 1, 32 S.W. 641; Logan v. State, 54 Tex.Cr.R. 74, 111 S.W. 1028; Smith v. State, 54 Tex.Cr.R. 298, 113 S.W. 289; Northern Texas Traction Co. v. Danforth, 53 Tex.Civ.App. 419, 116 S.W. 147; Houston Electric Co. v. Faroux, 59 Tex.Civ.App. 232, 125 S.W. 922.

"Acts classifying according to population, which have been held to be local laws in Alabama, have been so held on account of the fact that some additional point of classification was contained in the act which would make its operation in other counties as might come within the population prescribed dependent upon the enactment of additional legislation. No such localizing feature exists in the present act under attack. It will operate exactly the same in all counties which hereafter attain a population of 300,000. In every county which reaches that population the accused defendant in a capital case will be entitled to strike from a list of 30 jurors drawn by lot. In noncapital felony prosecution, the list will be 24, and in misdemeanor prosecutions the list will be 24 subject to a minimum of 18, when 24 jurors are not available.

"Another reason justifying the limiting of the list from which a defendant is entitled to strike to 30 jurors is that of necessity more than one judge (whether he is working in that county because he is permanently placed there by an act of the Legislature, or whether he is sent there by order of the Chief Justice) will be required to handle the increased volume of litigation in such counties. This means that a greater number of jurors must be summoned so as to enable the judge to dispatch the work of the court. In Jefferson county, and it is likely that the same state of things will exist in any and every other county reaching the 300,000 population, approximately 150 jurors are required for each week. Ten judges are at work daily in the court at Birmingham. To allow the defendant in every criminal case to strike from the entire panel of jurors organized for the week, would result in a tremendous delay and expense to the county, arising from the fact that it would take several times as long to strike a jury from the entire panel than it would from a lesser number, and only one judge at the time could be obtaining a jury. Under the act now assailed, several judges can be obtaining juries at the same time. It is a conservative estimate that to obtain a jury from a list of 150 jurors would take at least an hour and a half to two hours. During that time, and the process would be repeated time and time again throughout the week, tremendous delay would be inflicted upon the court. Under the act now assailed, several judges can be obtaining juries at same time.

"The abolition of the special venire is without legal consequence. It is a mere fantastic appendage to the regular method of obtaining jurors with no further consequence than to increase the number, from which the defendant was allowed to strike. Jurors on the so-called special venire are drawn from the same box as the regular jurors. They are simply more jurors. Umble v. State, 207 Ala. 508, 93 So. 531. The special venire sections of our statutes at most only assure a defendant charged with capital felony to a list of 30 jurors from which to strike. Section 8646 of the 1923 Code. He is allowed that number by section 2 of the act now challenged by the defendant. If a limitation upon the number from which the defendant is to be allowed to strike can be constitutionally enacted as general legislation for counties of a large population, then the abolition of the special venire as a part of the process of limitation is apt and appropriate, and is equally constitutional as general legislation.

"Section 45 of the Constitution.

"The defendant contends that the act in question is void as being violative of section 45 of the Constitution. The defendant does not point out what particular part of section 45 is violated, and cites no authority indicating what part of section 45 she claims to be violated by the act.

"The objections to the act which could be conceivably urged are: (1) That the act contains more than one subject; (2)

that the subject is not clearly expressed in the title; and (3) that the act amends previously existing laws without such previously existing laws being re-enacted and published at length.

"The court is clear to the conclusion that upon established rules of interpretation the act is not subject to any of these objections.

■ "Dealing with possible objection (1), it might be argued that the act deals with two subjects, namely (a) juries in criminal cases, and (b) juries in quasi criminal cases. But such contention would be denied by the decision of the Supreme Court in the case of Hubbard v. State, 172 Ala. 374, 55 So. 614, upholding the jury law of 1909 (Laws 1909, page 305) with its comprehensive provisions creating a jury system for the trial of all sorts of cases. All of those provisions were held to be upon one subject.

■ "Dealing with possible objection (2), the settled canons of interpretation, as repeatedly declared and applied in the decisions of the Supreme Court, set at naught any possible contention that the matters and things appearing in the body of the act are not foreshadowed by the title.

"'Subject' [as used in section 45 of the Constitution] is a very indefinite word. A phrase may state the subject in a very general or indefinite manner, or with minute particularity. The subject of laws with such titles as the following, 'To adopt a penal code,' 'To adopt the common law of England in part,' 'To adopt a code of laws,' 'To ratify the by-laws of a corporation,' would be expressed in a very general way, and very little knowledge of the specific provisions of the laws could be gleaned from the title; yet it would nevertheless be true that the subject was described in the title. * * * It is impossible to prescribe any standard of particularity for the legislature. The constitution has not attempted to do so. It exacts from the legislature an announcement in the title of the subject, but does not dictate any degree of particularity. This is a matter left to legislative discretion.' Ex parte Pollard, 40 Ala. 77, 98.

"'The title of a bill may be very general, and need not specify every clause in the statute. Sufficient if they are all referable, and cognate to the subject expressed.' Ballentyne v. Wickersham, 75 Ala. 533.

"'Our decisions show that this court has interpreted this section [Section 45 of the Constitution] in a 'very broad and liberal spirit, which is proper, not only because no act should be lightly declared unconstitutional, but also because the general purpose of the section should be kept in view, and it should not be so construed as to operate as an unreasonable restraint on important legislation. One who formulates the title to an act may make it as broad and comprehensive as he pleases, and the act will be upheld if the matters provided for are referable and cognate to the subject expressed, or if the matter provided for is not incongruous to the subject, or where all its provisions are allied to the subject expresssed; or, as is usually said, germane and cognate to it or complementary to the idea expressed in the title.' Lovejoy v. City of Montgomery, 180 Ala. 473, 61 So. 597, 599.

"'Much [respecting the content of the title] must be left to the legislative discretion, with which there cannot be judicial interference. * * * The form of this title must be left to the Legislature, and not to the courts.' Glasscock v. State, 159 Ala. 90, 48 So. 700, 702.

"'It is not essential that the title of a statute shall define or declare the subject with the most precise accuracy.' Adler v. State, 55 Ala. 16, 21.

"'A title should be liberally construed, and an act will be upheld if there is a substantial compliance with the constitutional requirement, although the title does not express the subject or object as unequivocally as possible. If the words used in a title, taken in any sense or meaning they would reasonably bear, are sufficient to cover the provisions of the act, the act will be sustained, even though such meaning may not be the most common meaning of the words.' First National Bank of Eutaw v. Smith, 217 Ala. 482, 117 So. 38, 40.

■ "Applying these canons of interpretation to the act now in question, it is at once obvious that section 45 of the Constitution is not infringed by the act. Every step that could be possibly taken to place the 12 men in the jury box who are to try the criminally-accused defendant is a part of the process of the jury 'selection.' The title is broad enough to cover the enactment of any rule whatsoever touching the obtaining of a jury for the trial of criminal and quasi criminal cases.

Every rule affecting the method by which a jury is placed in the box for such cases is germane, cognate, and referable to, and allied with, the subject expressed in the title. Dean v. State, 100 Ala. 102, 14 So. 762, is a case directly in point. That case dealt with two acts; namely, an Act approved Feb. 12, 1891 (Acts 1890–91, p. 580), entitled 'An Act to regulate the trial of misdemeanors in Shelby county,' and an Act of 1892 (Acts 1892–93, p. 826), entitled 'An Act To amend an act entitled an act to regulate the trial of misdemeanors in Shelby county, approved February 12, 1891.' The bodies of these acts provided for the transfer of cases from the circuit court to the county court, the method of drawing juries, the terms of court, and the offices of clerk and solicitor. The act was held valid as against the contention that the subject was not expressed in the title. It is worthy of note that articles 6 (page 192, vol. 4, Code of 1923) and 7 (page 193, vol. 4, Code of 1923) having to do with the obtaining of juries in noncapital cases and capital cases, respectively, are respectively captioned as follows: 'Mode of Selecting and Empanelling Juries in Criminal Cases Other Than Capital Cases,' and 'Capital Cases; Mode of Selecting and Empaneling Jury.' See, also, the case of Tatum v. State, 82 Ala. 5, 2 So. 531, which held that an act of the Legislature, entitled 'An Act to more effectually secure competent and well-qualified jurors in the several counties of this state,' clearly foreshadowed a provision in the body of the act reducing the number of peremptory challenges in capital cases from 21 to 12.

■■ "Dealing with possible objection (3), the provision of section 45 that no law shall be amended by reference to its title only, but so much thereof as is amended shall be re-enacted and published at length, has no application to original acts like the act now assailed. Ex parte Pollard, 40 Ala. 77, 100, and numerous other cases appearing on page 25 of Michie's 1928 Code of Alabama.

"The court, therefore, decides that section 45 of the Constitution is not violated by the act.

"Equal Protection of the Law.

■■ "The defendant contends that the act in question is void as denying him the equal protection of the laws, and argues that the decision of the Alabama Supreme Court in the case of In re Dorsey, supports his contention. The answer to this contention is that the constitutional guaranty of equal protection of the law does not forbid reasonable classification based on real and substantial distinctions. Birmingham-Tuscaloosa Ry. & Utilities Co. v. Carpenter, 194 Ala. 141, 69 So. 626. The United States Supreme Court in the case of Gardner v. Michigan, 199 U.S. 325, 26 S.Ct. 106, 50 L.Ed. 212, held that it was no denial of equal protection of the law that different jury laws obtained in different political subdivisions of a state. To the same effect is the case of Chappell Chemical, etc., Co. v. Sulphur Mines Co., 172 U.S. 472, 19 S.Ct. 268, 43 L.Ed. 520. In 12 C.J. at page 1150, appears the following accurate statement of the law: 'Counties and municipal corporations may be divided into classes based on population, and laws may be enacted to apply only to those of a certain class.'

"At page 1185 of the same work, appears the following statement: 'Statutes relating to the selection of the jury and to the respective provinces of the court and jury which have been sustained as not denying the equal protection of the law include * * * statutes prescribing trial otherwise than by jury * * * in a certain city.'

"The court, therefore, holds that the act now under attack does not deny the equal protection of the law to the defendant.

"The Right of Trial by Jury Shall Remain

Inviolate.

■■ "The defendant contends that the act in question is violative of section 11 of the Constitution of Alabama, which declares that the right of trial by jury shall remain inviolate.

"In the first place, it is sufficient to note that statutes providing for special venires, giving the defendant two strikes to the state's one, and allowing the defendant to strike from a list comprised of the names of all jurors present and available, were not of force at the time of the adoption of the Constitution of 1901. These laws, so far as applicable to the trials of defendants being prosecuted in Jefferson county, Ala., were first enacted in the Jury Law of 1909. Therefore, the defendant's contention that she was entitled, in consequence of section 11 of the Constitution, to a jury obtained pursuant to these statutes can in no manner be regarded as well taken.

165 So. 783

"In the second place, section 11 of the Constitution does not prevent the Legislature from making such regulations as it thinks proper touching the selection of a jury, so long as the fundamental requisites of a jury are not impaired. Those fundamental requisites are that the jury shall be composed of 12 persons, that they shall be impartial, and that the verdict must be unanimous. 16 R.C.L. page 181; Baader v. State, 201 Ala. 76, 77 So. 370. Those requisites are preserved by the act now in question. It is the universal and unvarying rule of all common-law jurisdictions that legislative regulations touching the manner in which jurors shall be selected, or the mode of procuring and impaneling a jury, do not infringe a constitutional provision that the right of jury trial shall remain inviolate so long as the essential elements of number, impartiality, and unanimity are preserved. 16 R.C.L. page 197. 'The method of selection is entirely within the control of the Legislature provided only that the fundamental requisite of impartiality is observed.' 16 R.C.L. 234, and cases cited. See the leading case of Com. v. Maxwell, 271 Pa. 378, 114 A. 825, 827, 16 A.L.R. 1134, wherein the court says: 'It was not intended to tie up the hands of the Legislature so that no regulations of the trial by jury could be made. * * * Other changes, such as the qualifications of the jurors themselves, the vicinage from which they shall come, the mode of selecting and summoning them, the regulation of venires, and notably, even the matter of challenges * * * have been held to be within legislative control.'

"As was said by the Supreme Court of Alabama in the case of South v. State, 86 Ala. 617, 6 So. 52, 53: 'The legislature has power at all times to increase or diminish the number of peremptory challenges to be allowed the state or the defendant in a criminal cause.'

"The regulations made by the act under attack in no respect infringe section 11 of the Constitution.

"It is therefore ordered that the motion for a new trial be denied, and that this opinion be entered upon the record in this cause."

The foregoing disposes of all the questions raised by this record which are of merit, and, finding no error, the judgment of the circuit court is affirmed.

Affirmed.