15 So.2d 300

## LOVEJOY v. STATE.

### 6 Div. 29.

Court of Appeals of Alabama.

June 30, 1943.

Rehearing Denied Aug. 10, 1943.

. Erle Pettus, of Birmingham, for appellant.

Wm. N. McQueen, Acting Atty. Gen., and Forman Smith, Asst. Atty. Gen., for the State.

RICE, Judge.

Appellant, tried under an indictment charging him with the offense of murder in the first degree, was convicted of the offense of murder in the second degree, and his punishment fixed at imprisonment in the penitentiary for the term of twenty years.

He admitted that he shot and killed, with several shots from an automatic pistol,—shown to be a 45 Caliber—one Arthur Goodwin. But, under his plea of not guilty, he urged below—as shown by his requested charges, his testimony, and the oral charge of the court, all as exemplified in the record before us—a sort of bifurcated, Janus-headed, defense: Viz., that he shot in defense of his son, Johnnie Lovejoy, and, or —it is not clear which—of his own life— or, at least, to save himself from great bodily harm.

The testimony was in hopeless confusion and conflict. That for the State— some parts of which were included in, and might be extracted from, that offered by defendant (appellant)—tended to show an entirely unjustified killing, embracing all the elements of murder in the first degree; that for appellant tending, in a confused way, to support one or the other of the forks or prongs of his aforementioned Janus-headed defense. We have concluded that all the issues raised were properly left to the jury for solution.

A few, outstanding, facts are without dispute. For instance, there is no question but that Johnnie Lovejoy, the 24 or 25 year old son of appellant, was engaged in a fight, or serious controversy, with Arthur Goodwin, the deceased, in the barber shop or pool room of one Canada, at the time appellant came into said barber shop or pool room and almost immediately shot and killed deceased. Neither is there question but that animosity, or antagonism, had existed for sometime before the killing, toward Johnnie Lovejoy by deceased, on account of the relations he thought existing between Johnnie Lovejoy and the wife of deceased.

The question of whether Johnnie Lovejoy or deceased provoked or began the fight between them, which was in progress when appellant appeared on the scene, was one of the hotly contested issues in the case.

It is of course the law that—as regards that fork of appellant's defense **to**

the effect that he shot in defense of his son Johnnie Lovejoy—"as a general proposition, a person is justified or excused in killing in defense of another person when, *and only when,* the circumstances are such that the latter person would be justified or excused if *he* had committed the homicide in his own defense. A person interfering in a difficulty in behalf of another simply steps in the latter's shoes; he may lawfully do in another's defense what such other might lawfully do in his own defense *but no more;* he stands on the same plane, is entitled to the same rights and is subject to the same conditions, limitations, and responsibilities as the person defended; and his act must receive the same construction as the act of the person defended would receive if the homicide had been committed by him. * * * In general it is *necessary* (among other things, we interpolate) and sufficient to justify or excuse a homicide in defense of another that neither the *person defended* nor the defender shall be at fault in bringing on the difficulty." (Italics supplied by us). 30 C.J. p. 79.

Or, as we ourselves have said: "The theory of the defense was that he was justified in shooting and killing deceased, in that he was acting in the defense of the brother of defendant * * *. Defenses of this character are available under the laws of this state; the rule in this connection has been announced in numerous decisions of the appellate courts of this state and is to the effect, the right of one to defend another is coextensive with the right of the other to defend himself, and one who defends the other is upon no higher plane than the one defended; and so, if the one defended is not free from fault in bringing on the difficulty, his defender cannot be, for when one intervenes to defend another, even though that one be in imminent danger to life or limb, he does so at his peril, if he strikes in defense of one not free from fault in bringing on the difficulty. Stated otherwise, as expressed by Chief Justice Anderson, in the case of Griffin v. State, 229 Ala. 482, 158 So. 316, 317: 'It is well settled by the decisions of this court that he who invokes self-defense in protection of a third person is placed in the shoes of him whom he seeks to protect.'" Humphries v. State, 28 Ala.App. 159, 181 So. 309, 310.

And, in the opinion in the case of Vaughan v. State, 21 Ala.App. 204, 107 So. 797, 798, certiorari denied, by our Supreme Court, 214 Ala. 384, 107 So. 799, Presiding Judge Bricken speaking for this court, said:

"The law is that a son may strike in defense of his father, but under the law this right is only coextensive with the right of the father under the existing circumstances of the particular occasion to defend himself; in other words, the son's right to kill in defense of his father depends upon the same conditions as would be necessary to excuse the father under the plea of self-defense.

"We will not elaborate upon the elements of self-defense. Generally, the inquiry is: (1) Freedom from fault in bringing on the difficulty. (2) Is there reasonable room and ground for escape from injury? (3) Is the threatened assault of such nature as, if perpetrated, it is likely to produce death or grievous bodily harm? In other words, the essential elements of self-defense are, first, that the defendant must be free from fault, must not say or do anything for the purpose of provoking a difficulty, nor be unmindful of the consequences in this respect of any wrongful word or act; second, there must be no convenient or reasonable mode of escape by retreat or by declining the combat; and, third, there must be a present impending peril to life or danger of great bodily harm, either real or apparent, as to create the bona fide belief of an existing necessity."

Now in view of the law as we have quoted hereinabove it is at once apparent that, as bearing upon the question of who was the aggressor in the fight going on between Johnnie Lovejoy and deceased at the time appellant intervened, it was competent to introduce testimony tending to show, as was done, that acts of criminal intimacy had taken place between Johnnie Lovejoy and the wife of deceased prior thereto. Grimsley v. State, 20 Ala.App. 155, 101 So. 156.

With this testimony in the case, and conceding, for the present purpose, only, that there was testimony that the fatal shots were actually fired by appellant in defense of his son, there probably was no error in admitting all that testimony to the rulings admitting which exceptions were so stoutly reserved, tending to show a continuation after the killing, of the criminal, or other, sexual intimacy between Johnnie Lovejoy and the widow of deceased. 30 C. J. p. 186.

■ But the admission of the testimony as to the number of children left by deceased; of their partial abandonment by his widow acting in supposed concert with Johnnie Lovejoy; their predicament, treatment, and manner of being cared for by relatives, cannot be justified on any ground that occurs, or has been suggested, to us. Much testimony along this line was brought out by the State, all over appellant's objections, with due exceptions reserved. It seems unnecessary to specify it more particularly, here.

In all the rulings admitting in evidence the testimony mentioned in the last next preceding paragraph we think, and hold, the learned trial court committed error.

■ There seems no question but that testimony as to the number of children left by deceased is inadmissible in a murder trial. Fisher v. State, 23 Ala.App. 544, 129 So. 303, 304.

As we said in the opinion in the Fisher case just above cited, here we repeat: "It is not permissible to show the number of children left by deceased, or their ages. * * * 30 C.J. 177 § 400."

"If as a consequence of this unfortunate homicide it resulted, * * * that orphans were left to mourn the death of deceased, this fact of itself could shed no light upon the issues involved." Thomas v. State, 18 Ala.App. 268, 90 So. 878, 880. And see Stewart v. State, 18 Ala.App. 92, 89 So. 391.

We elaborate upon the above, but slightly. It is all too plain that the testimony we are discussing could have had no possible bearing upon any issue involved on the trial resulting in this appeal. Its very nature was calculated to highly inflame the jury against appellant. And its admission, we entertain no doubt, prejudiced him greatly. For the errors committed in this regard the judgment of conviction must be reversed.

Able counsel representing appellant has assigned on the record One Hundred and Seventy One (171) "errors." But we have examined the rulings underlying each of same.

In view of our conclusion that the judgment of conviction must be reversed because of the errors pointed out hereinabove, we deem it unnecessary to discuss the other assignments. The questions involved will in all probability not arise in their present form upon another trial.

We do think it not out of place to say—what all concerned already know—that appellant's written objections to going to trial, as well as his motion to quash the venire, were properly overruled on the authority of Dixon v. State, 27 Ala.App. 64, 167 So. 340, certiorari denied Id., 232 Ala. 150, 167 So. 349.

The trial court gave to the jury a very able and comprehensive oral charge—requiring some 14 pages of the transcript filed here for its transcription. In addition, he gave to the jury at appellant's request some 46 or 47 written charges. It seems improbable that the substance of any one of the some 50 requested and refused written charges which was not patently involved, inaccurate, confused, argumentative, abstract, or incorrect, would not be covered by and included in some charge otherwise given to the jury. But we leave a critical examination of said refused charges unmade at this time, as unnecessary for a correct disposition of the appeal.

The judgment of conviction is reversed and the cause remanded.

Reversed and remanded.