# Burton *v.* The State.

## *Murder.*

(Decided June 30, 1915. Rehearing denied November 18, 1915. 69 South. 913.)

1. *Homicide; Degree; Evidence.*—The evidence examined and held to sustain a conviction of murder in the second degree.

2. *Same.*—Since the statute requires that the jury shall fix both the degree of the crime, and the measure of the punishment in a homicide case, the court cannot be required to instruct the jury that they must convict defendant of murder in the first degree or else acquit him, nor was it error for the court to decline to set aside the verdict on that account.

3. *Jury; Venire; Quashing; Waiver.*—Where a defendant, in a murder case, waives in writing a special venire, as authorized by section 7264, Code 1907, there was no error in declining to quash the venire selected for the trial.

[Burton v. The State.]

4. *Same; Ground.*—The fact that some of the jurors constituting the panel were incompetent or ineligible to serve as such, furnishes no ground for quashing the regular and agreed panel; such objection going to the individual juror and not to the panel.

5. *Homicide; Evidence; Weapon.*—There was no error in permitting the state to show that a pistol was found in the wood near the scene of the homicide, or in allowing a witness to describe it and to testify that one chamber was empty, since such evidence tended to show the means by which the crime was committed, and that the pistol was that of defendant.

6. *Witnesses; Competency; Interest.*—A defendant, upon cross-examination, may inquire into the interest or feeling which a witness had in the prosecution, as affecting the worth or credibility of his evidence.

7. *Same.*—The bias or prejudice of a witness does not affect his competency, but the weight or credibility of the evidence he gives; hence, the court properly declined to allow a witness for the prosecution to be examined by defendant on his voir dire to ascertain his bias or prejudice.

8. *Same; Impeachment; Contradictory Statement.*—Voluntary statements made by a witness concerning the shooting, tending to exculpate the defendant and not to show his guilt except as it might be inferred from the identity of the pistol found with that of defendant's were admissible to show contradictory statements made by defendant; and if confessions, and they were voluntary, such statements were admissible as such.

9. *Homicide; Evidence.*—The description of the character of the mud at the scene of the shooting, and upon the clothes of defendant, and evidence as to whether a person could throw a pistol from where the shooting was done to where the pistol was afterwards found, and as to whether few or many persons passed the road about the time of the shooting, were admissible.

10. *Witnesses; Contradiction.*—Evidence as to a conversation had between defendant, the witness and one B., was competent to prove the statements of defendant in answer to the questions of B., and that defendant and B. differed in their testimony as to such conversation, since such evidence tended to corroborate B., and to contradict defendant.

11. *Examination; Character.*—Where defendant introduced as a character witness the pastor of his church, it was competent on cross-examination to inquire of such witness the motive which led him to inquire about the character of the members of his church, the defendant being one of that class.

12. *Homicide; Evidence.*—Where defendant was charged with shooting his father, evidence as to whether defendant knew that his father had insurance on his life, and if so, how much, was admissible as tending to show motive.

13. *Evidence; Opinion.*—There was no error committed in permitting witnesses to testify to the character and size of bullet holes which would be made by bullets of 32, 38, 41 and 44-caliber pistols at different ranges, and on entering and leaving an object, where

such witness has made observation as to and had had experience with such pistol.

14. *Charge of Court; Argumentative.*—Written instructions which are either argumentative or give undue prominence to parts of the evidence or possess misleading tendencies, are properly refused.

15. *Same; Covered by Those Given.*—It is never error to refuse charges which have been fully covered in written charges given.

16. *New Trial; Criminal; Review.*—At the time of the trial of this cause the denial of new trial in criminal cases was not reviewable on appeal.

APPEAL from Cherokee Circuit Court.

Heard before Hon. W. W. HARALSON,

William C. Burton was convicted of murder in the second degree, and he appeals. Affirmed.

HUGH REED, and W. J. LUMPKIN, for appellant.

W. L. MARTIN, Attorney General, and J. P. MUDD, Assistant Attorney General, for the State.

MAYFIELD, J.—Defendant was indicted for the murder of his father, and was convicted of murder in the second degree and sentenced to the penitentiary for 30 years.

At the time his father was killed the defendant and deceased were alone, riding in a buggy. The father was shot through the head, the ball entering under one ear and coming out above the opposite eye. Deceased was shot while in the buggy, or while attempting to alight therefrom, and, on being shot, fell from the buggy, and was by the defendant placed back in the buggy and carried to the store of Snead, about half a mile distant from where the shooting occurred, where he died within a few minutes. Only one ball or bullet penetrated the body of deceased.

There was some difference in the evidence of the witnesses as to the probable size or caliber of the ball which

inflicted the wound, this evidence varying the size from 32 to 44 caliber ball. The evidence of the state tended to show that the wound was inflicted by a 32 or 38 caliber ball, while that of the defendant, tended to show a 41 or a 44 caliber. The particular relevancy and materiality of this evidence was due to the undisputed fact that the defendant had with him, on the fatal occasion, a pistol which was of a 32 or a 38 caliber.

(1) The defendant's version of the killing was that he and his father, both of whom lived in Georgia near the line of Alabama, were over in Alabama to see some men for the purpose of swapping horses, and that while driving along the public road in a sparsely settled part of the country, and in a secluded spot in the road, they were approached by a highway robber, who hailed them and asked the defendant for a match, which request being granted, the highwayman stuck a pistol in the face of defendant and compelled him to stand up in the buggy, and searched him for money; that the robber found no money, but did take the pistol of defendant, which was on the seat under defendant; that the robber then ran his hand into the pocket of the father and took from him his pocketbook, and that the father then arose from his seat in the buggy and attempted to alight, saying that he would die before any one should take his money in that manner, or words to this effect; that the robber then fired the fatal shot into the head of the father, who fell back into the buggy, and that the horses jumped and the father fell from the buggy, the hind wheels of the buggy running over his legs; that defendant stopped the horses as soon as he could and, going back, raised his father in his arms and placed him in the buggy, and drove at once to Snead's store, where his father died; that his father never spoke after

he was shot; that the robber, after firing the shot, went off through the woods.

Dogs were obtained as soon as possible, which was late in the afternoon, the shooting having occurred about 10 o'clock a. m. There was evidence to the effect that these dogs took a trail, near the scene of the shooting, moving in the direction in which the defendant says the robber went, and followed it to a nearby barn, which was searched by the hunting party with the permission of the owner, but no one was found. The owner testified that about this time he lost a bridle from the barn, but did not know who got it. There was also testimony to the effect that the track of some one was seen in the woods, or near the road, and between the scene of the killing and the barn in question, and likewise evidence to the effect that a strange-looking man was seen in the road a mile or two from where deceased was shot, and on the same day of the shooting, and that this strange man corresponded somewhat in appearance to the robber described by the defendant.

The defendant, on arriving at Snead's store, or soon thereafter, told several different persons of the circumstances attending the killing of his father—in the main, what he testified afterwards on the trial. The evidence for the state, however, did tend to show contradictory statements by defendant as to the description and size of his own pistol and of the pistol of the robber, and as to the presence of blood and mud in the road at or near the scene of the shooting, and as to blood and mud on the clothing and shoes of the defendant. A pistol was found in the woods, near the scene of the shooting, with one empty chamber, which pistol corresponded to the description which the defendant had given of his own pistol. According to the defendant's statement,

the robber shot his father with the pistol of the robber, and not with that of the defendant; but the defendant claimed that he always carried his pistol with one chamber empty. There was evidence tending to show other contradictory statements by the defendant as to the circumstances or the details of the killing of his father.

The only possible motive which the evidence tended to show for the killing of the deceased, whether by the robber or by the defendant, was robbery, unless it can be said that the fact that there was some life insurance on the life of the deceased constituted the motive; but it was shown that this insurance was payable to the wife of the deceased, and not to this defendant.

There was evidence sufficient to carry the case to the jury, and to support a verdict of guilty.

(2) The defendant's counsel contend that the evidence showed him to be guilty of murder in the first degree, if guilty of any crime. The degree of the crime is a question for the jury, and not for the court. The statute requires that in homicide cases the jury must fix both the degree of the crime and the measure of the punishment, within the limits fixed by the statute. It was not error for the court to decline to instruct the jury that they must convict the defendant of murder in the first degree or else acquit him. The court properly submitted the question to the jury. There was likewise no error in declining to set aside the verdict on this account.

(3) There was no error in declining to quash the venire selected for the trial of this case. The defendant in writing waived a special venire, as he is authorized to do by section 7264 of the Code.

(4) It was likewise no ground to quash the regular panel of 75 jurors, agreed to, that some of the panel

were ineligible or incompetent to serve as jurors. It is never good ground to quash a venire that some of the jurors drawn, or constituting it, are ineligible or incompetent to serve in that trial, or in any other trial. Such objection goes to the individual juryman, and not to the whole venire or panel.

(5) There was clearly no error in allowing the state to prove that a pistol was found in the woods, near the scene of the shooting, nor in allowing the witness to describe the pistol so found, and to testify that it had one chamber empty. This evidence tended to show that the pistol found was the pistol of the defendant, and the one which he claims the robber took from him on the occasion in question. It was therefore open for the jury to infer that deceased was shot with this pistol, and not with the pistol of the highwayman as the defendant claims. There is no evidence to show that the highwayman would likely have left this pistol so near the scene of the crime, where the defendant and the deceased would have seen him put or throw it, and where the son could have gotten it and pursued the robber and possibly killed him with it. If the robber had desired to get rid of it, for fear of being captured with it, and that it would be evidence against him, he surely would have waited until he was out of sight of the defendant and out of range of the pistol before he threw it away. All these matters were open to inference by the jury, from the facts to which these witnesses and the defendant testified.

(6, 7) The interest or feeling which the witness Blair may have had in the prosecution would go to the weight of his evidence, but not to his competency. Consequently the court properly declined to examine the witness or allow him to be examined by the defendant, on his

voir dire examination, to ascertain his bias or prejudice. Such was proper on cross-examination by the defendant, and it was so allowed; but it went to the weight of his testimony, and not to its competency or admissibility.

(8, 9) There was no error in allowing various witnesses to testify as to conversations had with the defendant, about the shooting of his father. The statements by the defendant were shown to be purely voluntary. They were not confessions at all, but were all exculpatory. They were evidently admitted to show contradictory statements by the defendant, and were admissible for this purpose. None of them tended to show guilt except in the respect mentioned, and, as might be inferred from the identity of the pistol found, with that of the defendant. But if they had been confessions, they were shown beyond doubt to have been voluntarily made, and were therefore admissible as such.

(10) There was no error in allowing the witness to describe the character of the mud at the scene of the shooting, and of that found upon the clothes of the defendant.

There was no error in allowing the witness to testify as to whether or not a person could throw a pistol, from where the shooting was done, or from the road, to where the pistol was found.

It was proper to allow proof as to whether there were few or many people passing the road about the time of the shooting.

(11) There was no error in allowing the witness Findlay to testify to a conversation between the witness Blair and defendant. It was competent to thus prove statements by the defendant in answer to questions propounded by Blair, and also that the defend-

ant and Blair differed in their testimony as to their conversations on this subject; and it was therefore admissible to corroborate Blair and to contradict the defendant.

(12) There was no error in allowing the solicitor to cross-examine the character witness of the defendant, to show the motive or inducement which led him to inquire about the character of the members of his church, which class included the defendant, it being shown that the witness inquired of the defendant's character because the latter was a member of a church of which the witness was pastor.

(13) There was no error in allowing testimony as to whether or not the deceased had any insurance upon his life and, if so, how much. Such evidence tended to show motive for the homicide.

(14) There was no error in allowing any of the witnesses to testify as to the character and size of a bullet hole which would be made by bullets of 32, 38, 41, and 44 caliber pistols, at different ranges, and on entering an object and on leaving it. The witnesses were all shown to have had experience with such firearms, and to have made observations sufficient to give their opinions on this subject, and the question was very material, under the peculiar facts of this case.

(15) There was no error in refusing to give any one of the special instructions requested by the defendant. Each was either argumentative, singled out a part of the evidence, and gave undue prominence to the part so singled out, or possessed misleading tendencies.

(16) Moreover, every proposition of law attempted to be stated in any one of these refused charges was fully covered by one or more requested charges which were given in writing at the request of the defendant.

(17) The denial of a new trial in criminal cases is not reviewable on appeal in this state.

Finding no error, the judgment of the trial court must be affirmed.

Affirmed.

ANDERSON, C. J., and SOMERVILLE and THOMAS, JJ., concur.