257 So.2d 844

**Jerry Lee JUNIOR**

**v.**

**STATE.**

**6 Div. 10.**

Court of Criminal Appeals of Alabama.

Dec. 14, 1971.

Rehearing Denied Jan. 11, 1972.

George E. Trawick, Birmingham, for appellant.

MacDonald Gallion, Atty. Gen., and W. Mark Anderson, III, Special Asst. Atty. Gen., for the State.

ALMON, Judge.

On May 6, 1965, a Jefferson County Grand Jury indicted appellant for the offense of burglary in the first degree. After a mistrial appellant was on January 30, 1968, found guilty by a jury of the offense charged in the indictment and his punishment was fixed at ten years in the penitentiary. Apparently the delay between the indictment and trial, resulting in a conviction, was occasioned by numerous motions and the aforementioned mistrial.

State's witness Brenda Cardwell testified that on March 26, 1965, she lived in an apartment on Third Avenue, South, in Birmingham with two roommates, Nancy Kerr and Sandra Watson. This downstairs apartment consisted of two bedrooms, a living room, dining room, kitchen and bath. According to Miss Cardwell she, along with her two roommates and a friend, arrived at her apartment at 5:30 P.M. on the above mentioned date. The friend who was visiting them for the weekend and Nancy Kerr left the apartment, leaving only Miss Cardwell and Miss Watson.

Between 8:30 and 9:00 P.M. that evening Miss Cardwell retired to her bedroom and went to sleep. She was awakened by sharp pains in her chest and upon opening her eyes saw a Negro man over her stabbing her with an ice pick. She screamed and her roommate, Miss Watson, ran into the bedroom where she was and turned on the overhead light. Miss Cardwell testified that when the light came on she observed the face of her assailant. When she first awakened the overhead light was not on but there was light in her room emanating from other portions of the apartment. The man put his hands over his face and when Miss Watson saw him he ran one way and she, another. The assailant fled through the hall to the other bedroom and apparently out the window. Both girls later identified the appellant at a police lineup as the man in the bedroom that night.

Miss Watson testified that she was in the kitchen when this incident occurred and upon hearing her roommate scream ran to the bedroom and turned on the overhead light, where she saw the appellant on all fours on Miss Cardwell's bed. She then ran outside to scream for help and upon returning to the bedroom and finding the appellant gone called the police. She further testified that while calling the police she heard sounds of curtains coming together and a window being closed. The windows were described as having sliding metal frames. From outside the bedroom window opposite the one in which Miss Cardwell was, she heard a male voice calling her an obscene name.

The testimony of Miss Cardwell and Miss Watson was to the effect that both bedroom windows and the front door were closed when Miss Cardwell retired. The apartment did not have a back door entrance.

Detective Albert Wallace testified that on the night of the crime he went to the

back of the apartment and noticed that the window screen "was removed and bent, and sitting down beside the back of the building . . . to one side of the window."

Briefly summarized, the issues argued in brief are as follows:

(1) Systematic exclusion of Negroes from both grand and petit juries.

(2) Exclusion of females from jury service.

(3) Exclusion of citizens from the Bessemer Division from serving on juries in the Jefferson Division.

(4) That the provisions of the law pertaining to juries and the jury board of Jefferson County found in Tit. 62, §§ 196–228; Appendix §§ 713–726, Code of Alabama, 1940, recompiled 1958, are not in conformity with the general law of the State found in Tit. 30, §§ 1–100, Code, supra, and consequently were a denial of equal protection of the laws to appellant. More specifically, the objections go to the composition of capital juries.

(5) The State failed to adequately prove a breaking and entering of the apartment as a necessary element of the crime of burglary.

(6) The improper influence of Detective Wallace, a witness for the State who was summoned as a juror, in having discussions with members of the jury venire.

(7) That the pre-trial confrontation between appellant and witnesses Brenda Cardwell and Sandra Watson for the purpose of identification without the presence of an attorney was improper.

## I.

The evidence at the several pre-trial hearings on appellant's motions to quash the jury venire because of systematic exclusion of Negroes was as follows:

Julian Swift, Clerk of the Circuit Court of Jefferson County, testified that court records do not show the race or color of the grand jury or petit juries. He testified that the jury board maintains a master roll of qualified jurors, and they appoint deputies to operate that office. Then the presiding judge draws or selects the grand jury for service in the county. This judge draws from the jury box about 280 names; the jury board fills the jury box every two years; and it contains a minimum of 1% of the total population.

Swift said that out of 135 or more jurors in the jury room on Mondays there might be from 4 to 15 Negroes but he stated that he has seen as many as 6 serving on a jury of 12. He said that especially within the last twelve months it is not unusual to see Negroes serving on juries. Swift also said that in the past twelve months there have not been many grand juries which did not have Negroes on them.

W. R. Whitley, Clerk of the Jury Board, testified that in August of 1965 the board placed 48,176 names in the jury box for the Birmingham Division. He said most of these names came from making a house to house survey of the county. This work is done by five field agents, none of whom are Negroes. However, Whitley testified that the jury board got the names for field representatives from the civil service register and no Negroes had ever applied under the civil service regulations. The field agents use their own discretion and are told to get all the names they can. They are instructed to cover the entire county and have two years to get the names. He further testified that people with exemptions are omitted, unless they request being placed on the list.

J. F. Cheatwood, Clerk of the Jury Board in August, 1963, testified that the field agents covered all county precincts and that 90% of the work was done by a house to house survey. He said that the agents would leave postcards for the residents to fill out if they were not at home. In white areas of the city they would get back about 50 to 60% of these cards but in

Negro areas they would get back only 10 to 15% Cheatwood testified that he covered the Negro neighborhoods personally. He testified that it was hard to get the residents to come to the door in predominantly Negro neighborhoods. He said he never failed to put a name in the jury box because the person was black. Cheatwood further testified that out of 48,000 names taken in a two year period, the courts would draw out about 200 per week, which would be about 14,000 in a two year period. He said the remaining names were not used over, that the records were destroyed, and the agents started over with a new list for the next two year interval. He said out of the approximate 200 jurors called per week, only 90 to 100 actually served after strikes, excuses, etc. He testified that the agents bypassed white and colored slum areas. The witness also stated that when the jury board came to the office, it was merely to oversee the clerical functions, to see that the office was functioning smoothly, and to make suggestions. He also stated that the jury board made spot checks of the final compilations.

Hon. Arthur Shores, Birmingham attorney, testified for appellant saying that he had never seen a Negro on a jury in which a Negro was charged with assaulting a white woman. He also said it was rare that he had ever seen a Negro serving on a petit jury in Jefferson County. Shores further testified that out of 125 people in the juryroom on Mondays, he would see only about 12 Negroes.

Hon. D. C. Newton, an attorney in the Birmingham area, also testified that he had seen only about 4 Negroes on juries in his ten years of practice in Birmingham.

It was stipulated (1) the jury venire empanelled to serve for the week of this trial had 6 Negroes in a venire of 110 persons; (2) all witnesses who testified to their observations of the ratio of white persons to Negro persons called for jury duty would testify that the same ratio prevails at this time; (3) all qualified jurors were not placed on the jury list; (4) all witnesses who testified on motion to quash the indictment would say the same thing on the motion to quash the venire (these two motions alleged basically the same points); (6) citizens from the Bessemer Division were excluded from the jury box and roll from which this venire was drawn; and (7) the jury board left out the names of people who have an exemption unless they asked to be put in the box.

Appellant cites no cases in brief to support his claim of systematic exclusion of Negroes from the jury venire.

█ It is now well settled that the aim and purpose of the law is to obtain juries which truly represent a cross-section of the community. But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him, nor on the venire or jury roll from which grand and petit juries are drawn. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.

██ The appellant's contention in this case must be grounded upon proof that Negroes have been the victims of improper discrimination and exclusion from jury service in the jury selection process. But purposeful discrimination must be proven and may not be assumed or merely asserted, and the quantum of proof necessary to establish such fact is a matter of federal law. *Swain*, supra.

█ The Fifth Circuit Court of Appeals in Billingsley v. Clayton, 359 F.2d 13, decided April 5, 1966, has thoroughly canvassed the jury selection process in Jefferson County. The jury selection process there assailed was the 1962 survey conducted by the Jefferson County Jury Board which led to the 1963 filling of the jury box from which this appellant's grand jury was drawn. The facts in *Billingsley*, supra, are almost identical to the ones in the case at bar. The Fifth Circuit concluded as follows:

"Rather than systematic exclusion (which also embraces token systematic

**524**

inclusion) of Negroes from the jury rolls of Jefferson County, we are convinced that the record fails to show a lack of good faith on the part of jury officials to obtain qualified Negroes for jury service. The system used has not worked perfectly in every instance, but the Jury Board has not allowed racial considerations to poison their jury selection process according to the record before us. The record reflects a good faith, bona fide effort on the part of the Board to give the Negro citizens of Jefferson County at least an equal, if not a privileged opportunity, to be called for jury service.

". . . For reasons not apparent from the record, it is evident that a large proportion of the Negro community is either uninterested in jury service, or being interested, does not avail itself fully of the opportunity to render jury service. The techniques used by the Jury Board have made the opportunity available."

The trial court therefore properly denied appellant's motion to quash the jury venire on the ground of systematic exclusion of Negroes.

II.

Appellant contends that the exclusion of females from the jury venire from which the grand jury was drawn which returned the instant indictment was unconstitutional.

It is well known that prior to September, 1966, females were excluded from jury service by legislative act. There is no claim that females were excluded from jury service on January 30, 1968, the date of appellant's trial. The objection goes only to the formation of the grand jury. On September 12, 1966, Acts Nos. 284 and 285, Acts of Alabama, Special Session, 1966, became effective, which required the jury commissions and jury boards of this State to place the names of qualified females on the jury rolls.

In White v. Crook, 251 F.Supp. 401, decided February 7, 1966, a three judge federal district court held in a civil suit brought by a male and female resident of Lowndes County that state action in denying jury service to all females in this State was unconstitutional. In so holding, the court stated:

". . . This Court believes public policy is best served by holding that that part of the decision in this case to the effect that Alabama's prohibition of jury service for women is unconstitutional should be prospective in its application, and, for that reason, should have no retroactive effect. See generally, Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601, and Tehan, Sheriff, etc. v. United States ex rel. Shott, January 19, 1966, 382 U.S. 406, 86 S.Ct. 459. . . .

"As to that part of this Court's order relating to jury service in Alabama for women, we believe there should be some reasonable delay in its going into effect. Even though it is clear—and we do here unequivocally declare—that women in Alabama have a constitutional right not to be arbitrarily excluded from jury service, it is the feeling of the members of this Court that the several practical problems, including a determination of whether service is to be compulsory or voluntary and the availability of physical facilities, require that the State of Alabama be given a reasonable time to comply with that part of this Court's decree. In this connection, since the next regular session of the Alabama Legislature is not scheduled until January, 1967, the defendants should be allowed until June 1, 1967, considered by this Court to be a reasonable period prior to the time the defendants should be required to include women as jurors."

Inasmuch as the instant indictment was returned on May 6, 1965, well before the federal deadline, we find no error.

Our Supreme Court reached the same conclusion in Black v. Wilson, 281 Ala. 6, 198 So.2d 286.

Moreover, appellant was not a member of the group which had been excluded from jury service. Butler v. State, 285 Ala. 387, 232 So.2d 631.

### III.

■ Act No. 213, Local Acts of Alabama, 1919, divided the Jefferson County Circuit Court into two divisions by creating the Bessemer Division. The insistence that the jury which tried this case should have been drawn from the qualified jurors from the entire County rather than from the territorial jurisdiction of the division known as the Birmingham Division is without merit. Evans v. State, 201 Ala. 693, 79 So. 240; Hardeman v. State, 19 Ala.App. 563, 99 So. 53; Porter v. State, 20 Ala.App. 74, 101 So. 97; Shell v. State, 2 Ala.App. 207, 56 So. 39.

### IV.

■ As to appellant's fourth contention regarding the constitutionality of the general law of local application as it affects the composition of capital juries in Jefferson County, see Dixon v. State, 27 Ala. App. 64, 167 So. 340. *Dixon* is dispositive of all appellant's contentions on this point and particularly the denial of the equal protection claim. We quote therefrom:

"The defendant contends that the act in question is void as denying him the equal protection of the laws, and argues that the decision of the Alabama Supreme Court in the case of In re Dorsey, [211 Ala. 700, 100 So. 923] supports his contention. The answer to this contention is that the constitutional guaranty of equal protection of the law does not forbid reasonable classification based on real and substantial distinctions. Birmingham-Tuscaloosa Ry. & Utilities Co. v. Carpenter, 194 Ala. 141, 69 So. 626. The United States Supreme Court in the

case of Gardner v. Michigan, 199 U.S. 325, 26 S.Ct. 106, 50 L.Ed. 212, held that it was no denial of equal protection of the law that different jury laws obtained in different political subdivisions of a state. To the same effect is the case of Chappell Chemical, etc., Co. v. Sulphur Mines Co., 172 U.S. 472, 19 S.Ct. 268, 43 L.Ed. 520. In 12 C.J. at page 1150, appears the following accurate statement of the law: 'Counties and municipal corporations may be divided into classes based on population, and laws may be enacted to apply only to those of a certain class.'

"At page 1185 of the same work, appears the following statement: 'Statutes relating to the selection of the jury and to the respective provinces of the court and jury which have been sustained as not denying the equal protection of the law include * * * statutes prescribing trial otherwise than by jury * * * in a certain city.'

"The court, therefore, holds that the act now under attack does not deny the equal protection of the law to the defendant."

### V.

■ There was sufficient evidence, either direct or circumstantial, for the jury to conclude that all windows and doors in the apartment were closed. The evidence further tended to show an entrance by the accused through a window in Sandra Watson's bedroom, since a screen which had previously been in place there was removed. Cox v. State, 33 Ala.App. 395, 34 So.2d 179, holds that a breaking is shown if the accused entered by opening a closed door. There is no necessity to show that a door or window was locked. Adair v. State, 19 Ala.App. 174, 95 So. 827; Russell v. State, 36 Ala.App. 19, 52 So.2d 230. It is well settled that a breaking may be shown by circumstantial evidence. Dupree v. State, 148 Ala. 620, 42 So. 1004.

## VI.

Appellant argues that the trial judge erred in not quashing the venire due to the presence and influence of Detective Albert Wallace who was a witness in the case and two other police officers who had been summoned to serve on the jury venire. The evidence showed that the trial judge drew 36 jurors and 16 extras. These jurors were questioned extensively about talking with Detective Wallace. Two jurors reported they had talked with Wallace and the court permitted a challenge for cause as to these jurors. In the case of Haynes v. State, 40 Ala.App. 106, 109 So.2d 738, cert. denied 268 Ala. 546, 109 So.2d 746, the victim of the crime was summoned to serve on the venire. In that case the court said:

"Appellant's motion to quash the jury venire on the ground that Mr. John Chisholm, the owner of the property the subject of the indictment, was a witness before the grand jury which returned the indictment and was also summoned to serve on the venire to try appellant was properly overruled.

"In support of his motion appellant called as a witness Mr. John R. Matthews, Circuit Clerk of Montgomery County, who testified that Mr. Chisholm was excused from jury duty before the jury was empanelled, because he was over sixty-five and exempt from such duty; that Mr. Chisholm appeared as a witness before the grand jury, but he did not know in what case. Besides, no fraud in drawing or summoning the jurors was alleged. Title 30, Section 46, Code 1940; Burns v. State, 246 Ala. 135, 19 So.2d 450; Beatty v. State, 36 Ala. App. 699, 63 So.2d 287."

Furthermore, the entire venire is not subject to challenge unless it is alleged and proven that the entire venire is so tainted with prejudice as to lose its impartiality. Lane v. State, 40 Ala.App. 174, 109 So.2d 758. Also, in Burton v. State, 194 Ala. 2, 69 So. 913, we find:

"It was likewise no ground to quash the regular panel of 75 jurors, agreed to, that some of the panel were ineligible or incompetent to serve as jurors. It is never good ground to quash a venire that some of the jurors drawn, or constituting it, are ineligible or incompetent to serve in that trial, or in any other trial. Such objection goes to the individual juryman, and not to the whole venire or panel."

## VII.

Before trial appellant moved to suppress evidence of the pre-trial lineup where Miss Cardwell and Miss Watson identified appellant as the burglar. This motion was denied after a hearing. Objection was made at trial and additional evidence was heard.

Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, decided the same time as United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, held that the constitutional rule established in *Wade* and *Gilbert* applies only to those cases and all future cases which involved confrontations for identification purposes conducted in the absence of counsel after that date. These cases were decided June 12, 1967, and consequently would not be applicable to the instant confrontation since it occurred April 1, 1965, some two years prior to the decisions in *Wade* and *Gilbert*.

Thus, the question remaining is whether the confrontation for identification purposes was so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny appellant due process of law. *Stovall*, supra.

So far as we are able to ascertain from the record the lineup was conducted in the usual fashion. Miss Cardwell and Miss Watson were asked to observe a lineup

which was composed of five persons ranging from ages eighteen years to thirty-six years, weighing from 137 pounds to 160 pounds, and varying in height from five feet six inches to six feet. There was nothing conspicuous about their clothing.

Detective Wallace testified that he informed the appellant of his right to counsel when he was arrested and told him he did not have to make a statement and anything he said could be used against him. He further said he told appellant they were going to have a lineup and appellant did not object.

Miss Watson testified that she and Miss Cardwell discussed the lineup before going down to observe it but there was no discussion while the lineup was in process. She said she expected to see some suspects but not the man who committed the burglary. At one point, all of the persons in the lineup were requested to raise their arms in a motion as if to stab someone.

Both Miss Watson and Miss Cardwell stated that they recognized the appellant immediately after the men who participated in the lineup entered the room.

Miss Cardwell testified that she knew two of the men in the lineup were too small to be her assailant and one was too old. She was then asked if appellant was the only one in the lineup resembling her assailant, to which she replied that appellant stood out to her because of his face.

According to the testimony no improper suggestions were made to these witnesses by law enforcement officers.

It is our judgment that the lineup was not so unnecessarily suggestive and conducive to irreparable mistake in identification as to deny appellant due process of law.

Finding no reversible error, the judgment appealed from is due to be

Affirmed.