310 So.2d 484

John Will SMITH, alias

v.

STATE.

5 Div. 247.

Court of Criminal Appeals of Alabama.

April 1, 1975.

E. Drexel Meadors, Lanett, for appellant.

William J. Baxley, Atty. Gen. and Jonathan P. Gardberg, Sp. Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted of murder in the first degree and sentenced to life imprisonment. Prior to arraignment he was ascertained to be indigent and counsel was appointed to represent him throughout the trial proceedings and on this appeal. He pleaded not guilty and not guilty by reason of insanity.

Omitting the formal parts, the indictment is as follows:

"The Grand Jury of said County charge that before the finding of this Indictment Charles A. Wilson, alias Charles 'Rabbit' Wilson, alias Charlie Wilson, Norman Shealey, alias Norman Shealy, John Will Smith, alias Curtis Greer, alias Curtis Vines and Andrew McCollough, Jr., alias Andrew McCollough, whose true christian names are otherwise unknown to the grand jury unlawfully and with malice aforethought, killed William Henry Henderson, by beating him with their fist and stomping and kicking him with their feet, contrary to law, against the peace and dignity of the State of Alabama."

A severance was granted and appellant filed the following motion to quash the trial venire:

"MOTION TO QUASH TRIAL VENIRE

"Comes the defendant, John Will Smith, and moves the Court to quash the trial venire and for grounds of said motion the defendant sets down the following:

"1. That the trial venire was not compiled in compliance with Title 30, Section 20, Code of Alabama (Recomp. 1958).

"2. That the trial venire was compiled in a manner so as to systematically exclude members of the Negro race.

"3. That the trial venire was compiled in such a manner as to deprive defendant of due process of law guaranteed under the United States Constitution.

"4. That the trial venire was compiled in such a manner as to not include the name of every qualified person and that this action was done fraudulantly (sic) and in denial of defendant's constitutional rights.

"5. That the trial venire was compiled in such a manner as to systematically exclude persons who are employed on an hourly wage basis.

"6. That the trial venire was compiled in such a manner as to exclude a substantial number of those persons required to be included under Title 30, Section 18, Code of Alabama (Recomp. 1958).

"7. That the trial venire was not compiled in compliance with Title 30, Section 18, Code of Alabama (Recomp. 1958)."

A full-blown hearing was had on the motion to quash the trial venire at which hearing the three jury commissioners of Chambers County were called to testify at the hearing in support of the motion. For the sake of brevity, we will summarize the testimony of these three witnesses.

Mr. J. Prichard Guinn testified that he was appointed in May, 1973; that the jury commission met three or four times a year at the call of the chairman. He said he would get up a list of prospective jurors personally and turn the list over to the clerk of the jury commission. His best recollection is that he submitted a list of forty names to the clerk in January or February before this case was called for

trial in March, 1974. He said he did not consider the list of qualified voters of Chambers County but tried to get jurors over twenty-one and under sixty-five who were in good health, sound mind and who had a good mentality. He did not consider one's employment on the ground that the juror might lose money by serving on the jury. He further testified that the commission did not systematically exclude anyone, black or white, from jury duty; that there was a good representation of blacks on the jury roll and in the jury box of Chambers County. He further testified that he was in court when the jury was qualified for appellant's trial and noted that there were nineteen (19) blacks on the jury venire out of a hundred (100) jurors on the trial venire in this case. He did not know if the forty names he submitted were in the jury box but he presumed they were as he gave the list to the clerk of the commission.

Mrs. Dot Allen testified that she had been on the jury commission for about nine (9) years and served as clerk of the commission. She said they had a jury roll which was kept in the vault in the Probate Office and that the Circuit Clerk kept the key to this vault; that in making up the jury roll they would make contact with different citizens to get the names of prospective jurors and they would use the qualified voters list of Chambers County; that at times she would receive telephone calls from people who wanted to serve on the jury; that sometime in 1973 some attorney told her he did not think they had a fair representation of jurors from the Valley area. She mentioned this to Mr. Guinn who was more familiar with the people employed in that area which was much larger than most of the other beats in the county and asked him to get names from the Valley area; that Mr. Guinn would work the Valley area and bring to her a list of prospective jurors; that the other member of the commission would visit various beats and bring a list of names to be submitted for consideration by the commission to be placed on the jury roll. She said there were a great number of Valley people in the jury box.

Mrs. Allen said the jury commission met at least once a month and that they held meetings between the months of August and December each year; that the jury commission acts as a body when they select names for jury duty; that on a very few occasions she has put a few names in the jury box but at the very next meeting of the full commission, she informed them of her actions and they voted to ratify and confirm her actions. She further said that when she served with the old jury commission a few years ago, they added women, black and white, to the jury roll and the jury box of the county.

She further testified that the whole county was well represented in the jury box of Chambers County.

She said she did not go through the telephone books, the tax assessor's record, or the utility companies in the county as she felt all of these names were on the list of qualified voters, and that this was their best source of information in addition to the personal contacts made in the various beats in the county.

Mr. J. D. Burton testified that he was appointed to the jury commission in 1972. He said that once or twice a week he would go out in the county and get names to go on the jury roll and in the jury box; that since he had been on the commission, he had submitted to the clerk well over a hundred names and all the commissioners were present when names were added to the jury roll and cards were put in the jury box. He said that he frequently made personal contacts as he knew practically everybody in Chambers County and where they were employed; that he looked for people with integrity, good reputations and good health.

To direct questions propounded by the court, he testified that they did not exclude any person because he or she was black and that he felt that the number of blacks in the jury box represented a good propor-

tion of the black population of the county; that they did not exclude anyone because he or she worked for wages and that he knew where everyone was employed most of the time.

The court overruled and denied the motion to quash the trial venire.

■ The testimony of the jury commissioners in this case shows not only a lack of intentional or purposeful exclusion of Negroes, or others, from the jury roll or the jury box of Chambers County, but on the contrary demonstrates a conscious and meritorious effort on the part of all of them to gather, and to keep gathering, additional names of Negroes, and others, qualified for jury duty.

■ Fraud required to quash a venire is the intentional omission from the jury roll and the jury box of large numbers of legally qualified citizens. In Shields v. State, 52 Ala.App. 690, 296 So.2d 786, certiorari denied, 292 Ala. 749, 296 So.2d 793, this Court said:

"The fraud required to quash the venire is the intentional omission from the jury roll of names of a large number of legally qualified citizens, and such intentional systematic exclusion must be shown."

In Acoff v. State, 50 Ala.App. 206, 278 So.2d 210, this Court held:

"This Court is of the opinion that the appellant's motion to quash the jury on the basis of the alleged systematic exclusion of black persons was properly denied. The evidence here has failed to establish that the jury roll produced a result which was 'spectacularly not a cross section of the community.' Jackson v. Morrow, Fifth Cir., 404 F.2d 903. Moreover, there has been no evidence given that different standards of qualifications were applied by the jury commissioners to the black community or that the Dallas County Jury Commission was influenced by racial considerations in making its selection of prospective jurors. White et al. v. State, 48 Ala.App. 111, 262 So.2d 313; Bryant and Williams v. State, 49 Ala.App. 359, 272 So. 2d 286, cert. den. 289 Ala. 740, 272 So.2d 297."

Title 30, Section 46, Code of Alabama 1940, provides:

"No objection can be taken to any venire of jurors except for fraud in drawing or summoning the jurors."

In Junior v. State, 47 Ala.App. 518, 257 So.2d 844, certiorari denied, 288 Ala. 744, 257 So.2d 852, certiorari denied, 407 U.S. 923, 92 S.Ct. 2473, 32 L.Ed.2d 810, we said:

"It is now well settled that the aim and purpose of the law is to obtain juries which truly represent a cross-section of the community. But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him, nor on the venire or jury roll from which grand and petit juries are drawn. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.

"The appellant's contention in this case must be grounded upon proof that Negroes have been the victims of improper discrimination and exclusion from jury service in the jury selection process. But purposeful discrimination must be proven and may not be assumed or merely asserted, and the quantum of proof necessary to establish such fact is a matter of federal law. Swain, supra."

■ Even if there was some irregularity in the action of the jury commission in filling the jury box as required by law, the venire was not void in the absence of proven fraud. Holland v. State, 49 Ala. App. 104, 268 So.2d 883.

There was no proven fraud in this case. We hold the trial court was correct in overruling and denying the motion to quash the venire.

We turn now to a consideration of the facts in this case.

On Sunday evening around 6:30 P.M. on December 23, 1973, there was a jail break at the Chambers County jail. There was a number of inmates in the jail at that time. The deceased, Mr. William Henry Henderson was the jailor on duty at that time. Earlier in the day he had removed appellant from his cell and put him in the bull pen so that he could visit for awhile with a number of other inmates in the bull pen. At 6:30 P.M. the deceased went to the bull pen and asked appellant if he was ready to return to his cell and appellant said he was ready to go. Mr. Henderson opened the door to the bull pen and appellant walked out and immediately turned and shoved Mr. Henderson into the bull pen and hit him twice with his fist knocking him to the concrete floor of the cell. While he lay prostrate on the cell floor the appellant stomped and kicked him seven or eight times in his face and on his head. At least one other inmate struck the deceased twice with his fist. The entire episode was witnessed by another inmate who was serving time for the non-payment of a fine imposed upon him whose name was Frank James Daniel. Daniel testified that he saw appellant stomp the deceased with high heels on his shoes. He heard the deceased call for help several times and asked that someone stop him. Daniel saw appellant and three other inmates run out of the door to the bull pen and in a few seconds, Daniel saw appellant return to the bull pen, take Mr. Henderson's wallet out of his pocket and leave again. Appellant and some of the other escapees were later apprehended in Atlanta, Georgia, and returned to Alabama.

In the meantime Mr. Henderson on the bull pen concrete floor was still conscious but he was unable to get up. He was still calling for help. Daniel and another jail inmate, Lamar Jones, went in the bull pen and helped Mr. Henderson to his feet. He could move his legs but could not walk by himself. Daniel and Jones got on each side of Mr. Henderson and supported him by his arms and carried him down the stairs of the jail. The sheriff was called but could not be located. The Police Department was called and soon responded. Mr. Henderson was carried to a local hospital for treatment.

When Mr. Henderson arrived at the emergency room of the Chambers County Hospital, Mrs. Jo Ann Cole, L.P.N. was sent for and she stayed in the emergency room to assist Dr. Clemons in suturing the wounds to Mr. Henderson's face and head. She described Mr. Henderson's appearance when she first saw him in the emergency room. She testified:

"When I went into the emergency room he was very bloody. He was covered with blood. He had a large laceration on the right side of his head. His left eye was swollen to. He had some small lacerations on his forehead and his left ear was cut almost completely off."

She further testified that it took numerous sutures to close the cuts and lacerations.

Mr. Henderson's medical records at the Chambers County Hospital were subpoenaed to court. These records were certified as true and correct by the Administrator of the hospital. They were identified by the Circuit Clerk and admitted in evidence without objection.

Dr. N. A. Wheeler, Jr., one of Mr. Henderson's physicians, was called as a witness for the state. He identified the hospital chart and by reference to it he described Mr. Henderson's condition on admission to the hospital and the treatment administered to him and the various kinds of medications prescribed for the treatment of his injuries while he was an in-patient in the hospital. In his words, "He had an awful looking face, I don't know how he got it. On eye was completely swollen, his face was blue, he could hardly swallow, and couldn't talk and he was generally—his face and head was in a terrible condition."

From the record:

"Q. Were the wounds that you observed on Mr. William Henry Hender-

son consistent with those that could have been put there by having been stomped or kicked or hit with a fist?

"A. Yes, sir."

The doctor was permitted to read from the hospital chart the history of the injuries sustained by the patient as related to the admitting doctor. The history:

"He states that two of them—talking about escaping prisoners—threw him into the cell and began stomping him in the face and head. He does not believe that he was hit by any other object. He denies chest pain, difficulty in breathing, loss of consciousness and mental awareness. He is in relatively good health except for occasional asthma for which he takes a pill—Tedral SA tablets, when it develops."

The doctor further testified that the x-rays revealed a broken nose and some facial bones, which were also broken.

Mr. Henderson was discharged from the hospital on December 30, 1973, with instructions to go home, lie around and take it easy. The doctor continued to see Mr. Henderson as an out-patient. He saw him on January 4, 1974, and he was having headaches and was nervous. The doctor prescribed Fiorinal for the headaches and Valium 5 for nerves. He saw Mr. Henderson on January 8, 1974, and he was still having headaches, had a loss of balance, and his memory was becoming impaired.

The doctor further testified that a blood clot could cause headaches and a loss of balance. He was asked if he ever gave Mr. Henderson anti-coagulants and he said no—that anti-coagulants would cause a blood clot to bleed.

Because of Mr. Henderson's complaints about persistent headaches, dizziness, and loss of balance, he referred him to Dr. Louis A. Hazouri, a noted neurosurgeon in Columbus, Georgia, who was widely recognized as an expert in the field of neurosurgery.

Mrs. Mildred Henderson testified that she stayed with her husband during the time he was confined in the Chambers County Hospital. She had a bed in the same room with him. She also testified that she went with her husband to the Medical Center in Columbus, Georgia, where he was under the care of Dr. Louis A. Hazouri. Her husband's loss of memory was such that she was called in to authenticate the medical history to Dr. Hazouri. She further testified that Dr. Hazouri performed brain surgery on her husband and he died in the Medical Center on Friday night, January 18, 1974.

The state offered in evidence State's Exhibit 15, which was the testimony of Dr. Louis A. Hazouri taken by agreement of the District Attorney and all the attorneys representing all the defendants.

Prior to the offer of State's Exhibit 15, the trial judge made the following statement:

"Gentlemen of the jury, sometimes a witness cannot come to court because he is out of state, or is a doctor, or for some other reason. Now, there is a witness here, a witness that couldn't be here, Dr. Hazouri, I believe, of Columbus, Georgia. So to get his testimony before you they go and take a deposition, the lawyers and the defendant go to the office of the doctor, and they examine him just like they would if he were in court right here. So now they are going to read that deposition to you, and you consider it just like you would if the doctor was sitting here. All right, you may proceed."

Thereafter the record reflects the following:

"MR. AARON: Judge, may I add—

"THE COURT: Yes, sir.

"MR. AARON: A court reporter, a certified court reporter took down word for word everything that was said during the course of this deposition, just like Miss Maymie has been doing during the

course of this trial. Judge, where do you want us to start on this? With the caption or with the witness?

"THE COURT: Just read it all, read everything. Now, the defendant did not waive his right to object, and just the same as if the doctor was here testifying the defendant can still object.

"MR. AARON: We would like to offer the original of this deposition at this time.

"Whereupon, said deposition was marked State's Exhibit 15. State's Exhibit was read to the jury, Mr. Wallace reading the questions and Mr. Aaron reading the answers.

"STATE'S EXHIBIT 15:

"MR. WALLACE: (Reading) State of Alabama, Plaintiff Vs. Charles A. Wilson, Norman Shealey, John Will Smith, Andrew McCollough, Jr. In the Circuit Court of Chambers County, Alabama at LaFayette, Alabama, Criminal Division, Case No. 774.

"MR. WALLACE: At the time, Judge, this was the case number, but now the case number is 774-B.

"THE COURT: By severance it is now 774-B.

"MR. WALLACE: Appearances, Hon. R. C. Wallace, Jr., Deputy District Attorney for Chambers County, Alabama on behalf of the State of Alabama. Hon. William O. Walton, Jr., Attorney at Law, LaFayette, Alabama, on behalf of the Defendants. Hon. Michael D. Cook, Attorney at Law, Lanett, Alabama, on behalf of the Defendants. Hon. E. Drexel Meadors, Attorney at Law, Lanett, Alabama, on behalf of the Defendants.

"BY: William O. Walton, Jr.: I would like to demand the immediate release of the prisoners, Norman Shealey, Charles A. Wilson and John Will Smith, on the grounds that they have been brought to a foreign jurisdiction, Columbus, Georgia,

without their consent, that they are here, that there is no authority to bring them here. That there are here in the presence and in the custody of Alabama Officers, who have no authority in the State of Georgia, and that they are no Georgia—that there are no Georgia officers present, and there are no orders that we know anything about from the State of Georgia, therefore, I demand their immediate release.

"BY: R. C. Wallace, Jr.: In answer to that, the State simply says this: The defendants were brought to the State of Georgia to Dr. Louis A. Hazouri's office, by an order of one of the Circuit Judges of the Fifth Judicial Circuit, William I. Byrd. Also, want the record to show that we agreed that this is the deposition of Dr. Louis A. Hazouri, taken by R. C. Wallace, Jr., Deputy District Attorney, Chambers County, Alabama, for use as evidence at the trial, State of Alabama against Charles A. Wilson, Norman Shealey, and John Will Smith, before Mary Ann Karr, Court Reporter, at Dr. Louis—at Dr. Hazouri's office in Columbus, Georgia, on the 27th day of March, 1974, at 12:00 o'clock P.M., Eastern Standard Time, also general stipulations which we will give to you later.

"BY: Michael D. Cook: Let the record reflect that on behalf of Michael—of Mr. Meadors and myself, we make the same motion Mr. Walton just made, without repeating said motion.

"MR. WALLACE: If the Court please, I believe we can agree as to the stipulation made, general stipulation. There were no objections at that time, however, I will read it if they insist.

"THE COURT: All right, go ahead.

"MR. WALLACE: I would like to know whether they insist that I read the stipulation or not.

"THE COURT: Yes, read the whole thing.

"MR. MEADORS: Yes, we'd like for you to read it.

"MR. WALLACE: (Reading) It is stipulated by and between the parties and their counsel, that this deposition be taken by agreement of the parties at this time and place by Mary Ann Karr, a court reporter, who is to act as commissioner without formal issuance of commission to her; and that said deposition shall be taken and transcribed and certified by the Commissioner. The signing of the witness is waived. Said deposition is also taken pursuant to the provisions of Act Number 375 of the Acts of Alabama of 1955, page 901, Code of Alabama 1940, Title 7, Section 474, Sub-section (1). Except for objections as to the form of questions no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the ground of objection then and there assigned.

"Dr. Louis A. Hazouri, being called as a witness by the State—

"MR. MEADORS: Your Honor—

"THE COURT: Just a minute, Mr. Wallace.

"MR. MEADORS: If that deposition was taken under authority of that statute then there is no authority for using it in a criminal case. I have a citation to that effect.

"MR. WALLACE: If the Court please, he made no ojection to that and brought no law, and it's already in evidence. He made no objection.

"MR. AARON: And he stipulated to it and agreed to it—

"MR. WALLACE: By him, Mr. Meadors and Mr. Walton, to be used in this case.

"MR. MEADORS: I think you should put it in the record that it was taken under the correct citation.

"THE COURT: Under the correct statute, he's got the wrong statute there.

"MR. WALLACE: It was taken under this statute because it had—because Mary Ann Karr went by it, and this actual section right here says that it can be taken under that in this title, too.

"MR. MEADORS: It cannot be taken —I have the—

"THE COURT: It was taken by agreement of the parties under the proper statute. Overrule the objection."

As to the doctor's qualifications, he testified:

"I'm a native of Jacksonville, Florida. I attended the Universtiy of Florida, University of Florida Medical School. I had Post-Graduate training at the University of Cincinnati, Tennessee, and Union University. I am a member of American College of Surgeons, Diplomat of American Board of Neurosurgeons, and International Academy of Physicians."

The court ruled the doctor was qualified over appellant's objections.

The doctor testified that he first examined Mr. Henderson on the 9th day of January, 1974, in his office at 1519 13th Avenue, Columbus, Georgia. He described his findings as follows:

"On his examination, and being referred to me by consultation by Dr. Nick Wheeler of LaFayette, Alabama, the patient was found to complain of headaches, as well as unsteadiness, tendency to fall, particularly involvement of his balance from side to side, difficulty in using his arms and his legs, discoordinated, stated objects were blurred. He had evidence of multiple abrasions, bruises about the face, he had lacerations which had been healed over the scalp area, he

had subsiding abrasions about the right upper extremities. His pulse was 64, examination revealed multiple discoordination, his inability to use fine movements of both the arms and the legs, especially the left, showed some type of irritation to the brain, manifested by what is described as the Dybinsky sign, and his history of having currently had an injury, it being related to the possibility that he had a blood clot on his brain, was considered in all this, and hospitalization was recommended.

\*   \*   \*   \*   \*   \*

"He was 55 years of age, cooperative, he was complaining of not being able to focus his eyes, dizziness, headaches, difficulty in his memory, as well as keeping his balance. He advised me that he recently had cataract removel, (sic) also that he had been in reasonable good health, that he had a fracture to his nose and jaw. He told me that on or about the 23rd day of December, that during his occupation as a jailer he had been involved in some type of altercation, in which he transferred patients from one cell to another. He stated that he did not recall exactly what had transpired other than he found himself being carried down to the hospital. He knew that he had been beaten up until he passed out, and that was subsequent to his hospitalization. He remained hospitalized and then when dismissed he went to see Dr. Wheeler about his complaint. Dr. Wheeler then called me and told me that he was going to transfer him to Columbus for examination for the possibility of a blood clot, as the result of some injury to his head."

The next examination was conducted on January 11, 1974, and Mr. Henderson was showing progressive changes of deterioration and the doctor admitted him to the hospital for more tests and definitive examination and treatment. Mr. Henderson was carried to surgery and an operation was performed on his skull. The surgeon found two blood clots. He had a primary clot within the brain itself and another clot was present over the substance of the brain. The doctor was able to remove a part of one of the clots but, in his words, "the damage was so extensive that it was impossible to alleviate what damage had already been done." The doctor expressed the opinion that the combination of these blood clots caused Mr. Henderson's death. The doctor further testified that the injuries sustained by Mr. Henderson in the Chambers County Jail on December 23, 1973, when he was kicked and beaten until he lost consciousness, was the direct and proximate cause of the formation of the blood clots which caused his death.

From the record:

"Q. Doctor, state whether or not, in your opinion, did Mr. William Henry Henderson die as a result of any injuries that you personally examined him about, in which he sustained at the jail, Chambers County Jail in LaFayette, Alabama on December the 23rd, 1973?

"A. I consider that he died from some type of injury to his head, where or when I have no way of knowing.

"Q. Well, from his medical history of it, as to what happened on December 23rd, 1973, can you attribute that injury as to the injury he received on that date as to the cause of death?

"A. Yes, sir.

"A. Doctor, what was the cause of death?

"A. Cause of death was a massive blood clot both outside and inside the brain, which was considered to be post-traumatic in origin and subsequent to the injuries."

The doctor was subjected to extensive cross-examination by the lawyers representing all defendants but he was not shaken as to his opinion as to the cause of Mr. Henderson's death—"he died as a result of the blood clots in and on the brain."

At the conclusion of the deposition, the court reporter made the following certificate:

"State of Alabama Tallapoosa County. I, Mary Ann Karr, Court Reporter, Fifth Judicial Circuit, State of Alabama, do hereby certify that the foregoing deposition of Dr. Louis A. Hazouri was taken before me at Dr. Hazouri's Office in Columbus, Georgia, on the 27th day of March, 1974, at 12:00 o'clock, P.M., Eastern Standard Time, wherein the State of Alabama vs. Charles A. Wilson, Norman Shealey and John Will Smith, Defendants; That, the Defendants were present at said deposition, attended by their counsel, the Hon. William O. Walton, Jr., Attorney at Law, LaFayette, Alabama; Hon. Michael D. Cook, Attorney at Law, Lanett, Alabama, Hon. Drexel Meadors, Attorney at Law, Lanett, Alabama; And that the State was represented by Hon. R. C. Wallace, Jr., Deputy District Attorney, for Chambers County, at LaFayette, Alabama; That the said witness was duly sworn by me before the taking of his deposition; That the foregoing is a true and complete transcript of the testimony given by the witness and that the reading and signing of the deposition was expressly waived by counsel for the respective parties. In witness whereof I have hereunto set my hand this 30th day of March, 1974. Mary Ann Karr, Reporter."

The trial court allowed the deposition in evidence as it was read from the witness stand and made the following ruling:

"THE COURT: I sustain the objection to letting the jury actually take it out, but it's in evidence as it was read from the stand."

Appellant testified in his behalf. He admitted that Mr. Henderson came to the bull pen door to carry him back to his cell and that when Mr. Henderson opened the door, he shoved him in the bull pen and struck him with his fist two times, knocking him to the cell floor. He denied ever stomping or kicking him. He said another inmate, Charles Wilson, stomped Mr. Henderson three or four times in the face or on his head with hard high-heeled boots. He denied that he returned to the bull pen and took Mr. Henderson's wallet while he lay prostrate on the cell floor.

On cross-examination, the District Attorney asked appellant if he knew Timothy Gale Irvin who was in the Chambers County Jail the night before appellant's trial and he answered that he knew him. Appellant was then asked if he did not tell Irvin to tell Frank Daniel not to testify against him and replied, "No, sir, I didn't. I asked him to ask Daniel who was he gonna testify against."

On rebuttal the state introduced Irvin as an impeaching witness. After laying the proper predicate, Irvin was asked if appellant asked him to deliver a message to Daniel and Irvin answered in the affirmative. He was then asked what the message was that he should deliver to Daniel and he replied. "He told me to tell him not to testify against him today."

■ Appellant contends that Title 7, Section 474(1), Code of Alabama 1940, which authorizes the taking of depositions in civil cases, does not apply to criminal cases. This contention is absolutely correct. Ex parte Denton, 266 Ala. 279, 96 So.2d 296; Ex parte Rice, 265 Ala. 454, 92 So.2d 16.

■ But Dr. Hazouri's deposition is not controlled by the above cited Code section. It is controlled by the *agreement and stipulation* entered into by all of the attorneys appointed to represent the defendants named in the indictment and the Deputy District Attorney of Chambers County and was so held by the trial judge. All references to Act No. 375, and Title 7, Section 474(1) et seq., Code of Alabama 1940, must be treated as surplusage.

It is manifestly clear from the record that the attorneys representing the indicted defendants and the Deputy District Attor-

ney decided to take Dr. Hazouri's testimony by the method it was taken rather than resort to the cumbersome procedure prescribed by Title 15, Section 297 et seq., Code of Alabama 1940, for taking depositions in criminal cases, viz., by interrogatories and crossinterrogatories.

Title 15, Section 300, Code of Alabama 1940, provides:

"Depositions taken under the provisions of the three preceding sections are governed by the same rules which are applicable to depositions taken in civil cases · at law; and no such deposition can be read in evidence on the trial, if it appear that the witness is alive, and able to attend court, and within its jurisdiction."

 The method pursued · in taking the deposition of Dr. Hazouri does not in any manner offend the Due Process Clause.

We have carefully searched the record and have found no reversible error and, accordingly, the judgment of conviction is affirmed.

Affirmed.

All the Judges concur.